# CHARLESTON.

STATE *v.* CLYDE BEALE

(No. 5954)

Submitted November 8, 1927.    Decided November 22, 1927.

1. CRIMINAL LAW—*Application for Change of Venue in Criminal Case is Directed to Trial Judge's Sound Discretion; Burden is on Prisoner to Show Good Cause for Change of Venue; Good Cause for Change of Venue Must be Shown to Exist at Time of Application; on Application for Change of Venue, Facts and Circumstances Must be Shown Satisfying Court That Fair Trial Cannot be Had (Const. art. 3, § 14).*

    An application for change of venue in a criminal case is addressed to the sound discretion of the trial judge, and the burden is upon the prisoner to show good cause for the change. Such good cause must be shown to exist at the

time the application is made. Facts and circumstances must be shown satisfying the court that a fair trial cannot be had. (p. 623).

(Criminal Law, 16 C. J. §§ 307, 308, 320, 324.)

2. SAME—*Judgment on Application for Change of Venue Will Not be Reversed Except on Clear Showing of Abuse of Discretion.*

It is an established rule in this jurisdiction that the judgment of the circuit court upon such application will not be reversed, unless it plainly appears that there has been a clear abuse of such discretion. (p. 625).

(Criminal Law, 16 C. J. § 306.)

3. JURY—*Prohibition Against Putting on Jury List Name of Person Serving as Petit Juror Within Two Years is Exemption to be Exercised by Juror or Court, and Not One in Favor of Prisoner (Code, c. 116, § 3, and c. 159, § 3).*

The provision of Sec. 3, Chapter 116, Code, to the effect that the jury commissioners shall not put the name of any person on the jury list "who shall have been drawn and actually served as a petit juror within a period of two years" is an exemption to be exercised by the juror or the court, and was not intended to create an additional exception to those included in Sec. 3, Chap. 159, Code, in favor of the prisoner. (p. 625).

(Juries, 35 C. J. § 198.)

4. CRIMINAL LAW—*Court's Placing Jury in Hands of Deputy Sheriff Sworn to Keep Them Together Without Communication Will Not be Reviewed Except on Showing from Record of Abuse of Power Denying Defendant Fair and Impartial Trial (Code, c. 159, § 6).*

The action of the trial court in placing the jury in the hands of two deputy sheriffs, who were sworn to well and truly keep them together without communication, according to law, will not be reviewed by this Court, unless it affirmatively appears from the record that there was such abuse of its power as denied the defendant a fair and impartial trial. (p. 628).

(Criminal Law, 17 C. J. § 3576 [Anno].)

5. SAME—*Instructions Must be Considered as Whole; if One Instruction Fully Covering Principle of Law Applicable Has Been Given, Refusal of Other Instructions to Same Effect Differently Expressed is Not Error.*

Instructions must be considered together as a whole, and if one instruction has been given fully covering a principle of law applicable to the case, it is not error to refuse other instructions to the same effect, although differently expressed. (p. 630).

(Criminal Law, 16 C. J. §§ 2493, 2506.)

6.  HOMICIDE—*In Case of Felonious Homicide, "Corpus Delicti" Consists of Death and Existence of Criminal Agency as Cause Thereof; in Prosecutions for Felonious Homicide, Death Must be Proved Either by Direct Testimony or by Presumptive Evidence of Strongest Kind; Existence of Criminal Agency as Cause of Death May be Established by Circumstantial Evidence or Presumptive Reasoning on Facts and Circumstances.*

Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case.   (p. 631).

(Homicide, 30 C. J. §§ 529, 530, 531.)

7.  SAME—*Under Statute, Murder in Commission of, or Attempt to Commit, Rape is "First Degree Murder"; Evidence Held to Justify Instruction That if Deceased Died from Injury or Injuries by Defendant and Another or Either in Committing or Attempting to Commit Rape, Defendant Was Guilty of First Degree Murder (Code, c. 144, § 1).*

Under our statute, murder in the commission of or attempt to commit rape is murder in the first degree.   An instruction to the jury in this case to this effect and therefore that if they believed from all the evidence in the case beyond a reasonable doubt that the deceased came to her death as a result of an injury or injuries inflicted upon her by the defendant, or by the defendant and another, or by either of them, while they were acting together and in concert in committing or attempting to commit the act of rape upon the person of the said deceased, then the defendant is guilty of murder in the first degree, was properly given under the evidence. (p. 630).

(Homicide, 30 C. J. § 549.)

8.  HOMICIDE—*Evidence Held to Support Conviction of First Degree Murder.*

A case where a verdict of murder in the first degree will not be disturbed.   (p. 633).

(Homicide, 30 C. J. § 559.)

(NOTE:   Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

HATCHER, PRESIDENT, and LIVELY, JUDGE, dissenting.

104 W. Va.

Error to Circuit Court, Mingo County.

Clyde Beale was convicted of first degree murder, and he brings error.

*Affirmed.*

*W. A. Daugherty, James Damron* and *W. S. Wysong,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

WOODS, JUDGE:

Clyde Beale was tried in the circuit court of Mingo county for the murder of Rissie Perdue, and upon a verdict of murder in the first degree without recommendation, was sentenced to be hanged. From this judgment he brings error.

Beale, at the time a resident of Nicholas county, was visiting his half-brother, Levi Layne, at the latter's home at Vulcan, Mingo county, on the date of the homicide. Layne was conducting a store a short distance from his dwelling. Jesse Perdue lived a mile or more from the Layne store. On Sunday afternoon, Jesse Perdue and his wife, Rissie, the latter being twenty-four years of age, started out on a walk for the purpose of taking a few pictures. A heel came off of one of Mrs. Perdue's shoes, and the couple stopped in at Layne's store, sometime after four o'clock, for the purpose of purchasing a pair of slippers. Someone inquired concerning liquor, and Beale went out and returned with a bottle. All present drank. A storm kept the parties in the store for some time. After it had subsided the four above named proceeded to the Layne home, where Perdue and his wife were introduced to the members of the Layne household. While Perdue was acquainted with Layne, all the parties, including Beale and Layne, were strangers to his wife. Mrs. Perdue complained of being "doped" all evening, and after arriving at the Layne home tried repeatedly to go home. Her husband was beastly drunk, and apparently did not know much about what took place during the visit. While Layne denied it, his wife, daughter and servant girl testified that shortly before dark he compelled them by reason of his violent and threatening conduct to flee from the home and take refuge in the barn

for a while. And this fact finds support in the testimony of disinterested neighbors to the effect that Layne came out into the yard and discharged his revolver several times. Later we find Rissie Perdue out in the yard between the store and the Layne dwelling in company with the defendant, who is admittedly the last person who saw her alive. Her body was found on the bank of Tug River on the Tuesday morning following—a distance of some three and one-half miles from the Layne homestead. A post mortem examination disclosed two blood clots, one on the temple and the other in the right mastoid region, and the further fact that the deceased had met her death before her body was placed in the river.

The State contends that Beale and Layne had intercourse with Rissie Perdue, and that she was either killed by Beale while resisting his assault, or that she was killed to cover up the evidence of such intercourse. And to this end they rely on the testimony of Minnie Layne, the wife of Levi Layne, Maudie Layne, a daughter, and Pricey Sloan, a servant, who seem to have been cowed into inaction regarding the welfare of Rissie Perdue by reason of the terror induced by the acts of Layne and defendant. Some thirty minutes after Minnie Layne had gone to bed, she saw Layne (in his night clothes), Beale and Mrs. Perdue pass the dining room window. All the women in the house testify to the fact that the two men had Mrs. Perdue down on the ground under the grape arbor. Levi Layne's wife, in explaining what was going on, says: "You have a pretty good idea what it is. He was with her— she was lying down, he was down with her." And Pricey Sloan said Mrs. Layne called Layne an opprobious name. Layne's daughter, Maudie, says she saw the same thing, and that her father said, "Give me a little," three or four times; that Clyde Beale was holding his hands over deceased's mouth and throat at the time; and that her father was down on Mrs. Perdue. Pricey Sloan was also looking out of the window and saw all three down on the grass, Layne on top of the woman and Clyde Beale holding his hand over deceased's face; that they were there for about twenty minutes. Layne came back to the house when Mrs. Layne called. Clyde Beale remained outside with Mrs. Perdue. In about half an hour Clyde Beale

called to Layne to come quick that there was something wrong
with the woman, that she was strangling or choking.  Maudie
Layne heard them down in the garden and heard a struggling
noise, and heard Clyde Beale call her father to ''come down
here quick Levi'', about three times, that the woman was
dying, choking or something was the matter with her or
something like that'', and that her father said he was not
going down there, that there might be something done, and
they would lay it on him; but he got up and went down. Mrs.
Layne states that defendant called three or four times before
her husband got up and dressed and left.  Pricey Sloan heard
a ''loud scream'' just prior to Beale's call for Levi to come
down.  Layne was gone for an hour or more.  Beale, Perdue
and Layne testify that Beale came to the house between ten
and eleven o'clock and awoke Perdue, who got up and dressed
and went with Beale to look for the woman.  Beale's where-
abouts after he left Perdue at the latter's home about two
o'clock are not known, except that he states that he was out
looking for the woman.

Defendant contends that he interfered with Rissie Perdue's
going home as a matter of protection, since she was under
the influence of liquor, and seemed to be out of her head.  He
likewise denies any improper intercourse with the woman.
While he and Layne admit being outside at the time the women
say they saw them with Rissie Perdue under the grape arbor,
they both deny the acts so attributed to them.  Layne states
that he had been out to the toilet and was on his way back
when he met Rissie Perdue at a point between the garden
gate and the house.  Beale states that he was going to the
toilet, and that as he stepped out of the kitchen door he met
Layne returning.  He states that the deceased was there.  At
this time Layne explains that his wife called him the oppro-
bious name, and that he went on into the house.  He also
relies on evidence to the effect that early in the evening after
they had assembled at the Layne home that while Mrs. Perdue
was hallooing and claiming that she was ''doped'' that her
husband struck her in the face and knocked her against the
window sill.  He seeks to show that the blood clots discov-
ered at the post mortem examination were caused by Perdue's

rough treatment of his wife, and not caused by any acts of his own.

· Under the constitution and laws of West Virginia, a crime can be prosecuted and punished only in the State and county where the alleged offense is committed. Const. Art. III, §14. However, in the same provision it is provided that upon petition of the accused, and for good cause shown, the trial may be removed to some other county. But the accused bears the burden of proving to the satisfaction of the court the existence of such good cause. *State* v. *Weisengoff*, 85 W. Va. 271. It is *urged* in the instant case that an impartial jury could not be obtained in the county. In his petition the prisoner states that the sheriff had assumed an hostile attitude toward him, and was prejudiced against him. He sets up the fact that Levi Layne, who also stands indicted for the same offense charged against him, had secured an injunction against the sheriff restraining the latter from permitting Layne to be removed from the jail against his will or being subjected to grilling at the hands of any member of the department of public safety. Counsel for the prisoner cite no authority for the claim that hostility of the sheriff, merely as such, constitutes ground for change of venue. We have found no authority to that effect. The sheriff, charged with the enforcement of the law, is naturally, and should be, interested in bringing criminals to justice for crimes committed in his realm. So long as he acts in good faith, his activities in this direction are proper, and a prisoner charged with crime may not complain. Then, the only weight that may be given to the claim of hostility here, as a ground for change of venue, is the charge that he and his deputies "have been circulating throughout the county false reports to poison the minds of the public and the people of Mingo county against your petitioner and for the purpose of bringing about his conviction." What these reports were, the petitioner does not state. We are referred, however, to the newspaper articles which are made part of the petition. These articles merely attempt to give an account of the alleged crime, and are very dispassionately written, considering the high public importance of the case. They give not only the side of the prosecution, but that of

the defendant as well. They do not bear any impress that supports the contention of the prisoner, nor are they in the light of the evidence in the case false or inflammatory. The petition is supported by but two affidavits. The first is that of A. R. Stepp, Chief of Police of the City of Williamson. It is a recital in effect that by virtue of his office he is thrown in contact with not only the people living within the corporate limits of said city, but is acquainted with a large majority of the citizens of the county living outside of the city; that he has heard expressions from many of the people of the city and has heard the case discussed among people living outside of said city; that reports have been circulated to the effect that the defendants Beale and Layne had committed rape upon the deceased, had ravished and killed her, and thrown her body into the river; that from the expressions made by the people in and outside the city, he does not believe that Beale can get a fair trial by a jury in Mingo county. The second affidavit is merely to the effect that the Daily News, in which some of the accounts complained of were printed, circulates in some three or four counties in West Virginia and Kentucky; that its greatest circulation is in Mingo county; and that during the month of May, 1926, the average circulation in said county was something over 3,000 copies.

It will be noticed that Stepp's affidavit does not state what the expressions from the people were on which he bases his opinion that the defendant cannot obtain an impartial jury. Of course, it may be inferred, from his conclusion, that they were adverse to the defendant's interests. But this is not enough. Facts and circumstances must be shown satisfying the court that a fair trial cannot be had, not the mere belief or opinion of the affiant. Less than this is not sufficient under the statute permitting a change of venue for good cause shown. *Wright* v. *Commonwealth,* 114 Va. 872. It is not sufficient merely to show that great prejudice exists against the accused; it must appear that the prejudice against him at the time of trial was so great as to prevent him from receiving a fair and impartial trial. 16 C. J. 205. The offense here was committed on May 9th, the indictment was returned at the next regular July

term, and the trial thereon was begun on July 26th. The injunction was secured against the sheriff on May 28th. Hence, the action of the officers complained of was necessarily prior to that latter date. The cause for change of venue must be shown to exist at the time the application is made. We have held that the existence of local prejudice against the prisoner three months before the making of an application therefor is not sufficient to warrant the assumption that such feeling existed at the time of the application. *State* v. *Powers,* 91 W. Va. 737. The trial court must be allowed a wide discretion in deciding motions for change of venue, and it is the established rule in this, as well as other jurisdictions, that the appellate court will not reverse the judgment of the trial court unless it plainly appears that there has been a clear abuse of such discretion. *State* v. *Sheppard,* 49 W. Va. 582; *Looney* v. *Commonwealth,* 115 Va. 921; *Taylor* v. *Commonwealth,* 122 Va. 886. It has been held that the court is not precluded from acting on personal knowledge possessed by it. There are few cases that excite special public interest, where conflicting views and sentiments could not be presented upon the question of a fair and impartial trial. The court should bring to bear that knowledge which comes to every man of observation and experience of the varying and changing views of the masses in times of excitement, and again when passion has had an opportunity to subside. The man who presides over a judicial tribunal cannot, and should not as a judge, exclude from his mind, in the exercise of a purely discretionary matter, depending upon a condition of public sentiment, all knowledge and all impressions coming to him as a man. *Conor* v. *State,* 144 Ind. 297. Testing the case made here on the record by the rules we have adverted to, we cannot say that the court in its ruling erred to the prejudice of the prisoner. Our decisions show that we have seldom reversed the circuit judge on this question. It is only in a case where all the facts unite in showing a wide-spread hostility to the defendant in the county, as in the case of *State* v. *Siers,* 103 W. Va. 30, that such action will be taken.

The second assignment of error goes to the acceptance of jurors Robert Carr and C. A. Mayhew, over the objection of

the prisoner, on the panel of twenty. Carr had served on a jury in the same circuit court about fifteen months prior thereto. Section 3, Chapter 116, Code, provides that: ''The jury commissioners of each county shall, at the levy term of the county court thereof, annually, and at any other time when required by the circuit court of such county, without reference to party affiliations, prepare a list of such inhabitants of the county, not exempted as aforesaid, as they shall think well qualified to serve as jurors, being persons of sound judgment and free from legal exception, which list shall include not less than two hundred nor more than six hundred persons. But the name of no person shall be put on such list who shall have been drawn and actually served as a petit juror within a period of two years * * * provided, that in any county wherein there is criminal or intermediate court or court of common pleas, service on a petit jury in any such court shall not *exempt* a juror from jury service in the circuit court, nor vice versa.'' This two-year limitation found its way into our statute for the first time in the Acts of the Legislature of 1917, chapter 99, except the time in which a juror could serve was limited to four years from prior service. Its obvious purpose was to obtain a widely diversified jury service, as well as to relieve jurors from the burden of frequent service in this honorous position. It is a matter of common knowledge that the statute, in order to be entirely workable in sparsely populated counties, was reduced to two years by the Legislature of 1919. Acts 1919, Chapter 124, Sec. 3. The preceding section exempts certain public officials, physicians, dentists, druggists, postmasters etc., from serving on juries. Code, Chapter 116, Sec. 2. The juror challenged here, for the reason assigned, was not disqualified at common law. It has been frequently decided by the Supreme Court, and may be taken to be the established law with us, that the common law is not to be considered as altered or changed by statute unless the legislative intent be plainly manifest. The statute then to have the effect of a disqualification must be plain; and if the words used be consistent with a mere exemption as with a disqualification, they will be construed in the former, rather than in the latter, sense. *Booth* v. *Common-*

*wealth,* 16 Grat. 519. In the latter case it was held that a statute directing a sheriff "not to summon persons over sixty years of age" was a mere exemption. Under our statute it is the jury commissioners who are directed not to summon certain persons who have rendered such service within a specified time. In this statute we have the interpretation of the legislative will in the proviso hereinbefore quoted. It says that where there is more than one court in the county that service in one court "shall not exempt" a juror from jury service in another court. Mark the word "exempt" so used! Then, we are warranted in concluding that the statute under consideration in effect merely increases such list so exempted in section 2, to embrace those persons who have served within two years. As a universal rule an exemption from jury duty is not a disqualification to act as juror, nor ground of challenge to a juror. 35 C. J., Sec. 198, on Juries, and cases there cited. Then, anyone inadvertently placed on the list by the commissioners in derogation of the statute could claim the exemption, or the court on its own motion might release such juror under the sanction of the statute. This latter course was held not to be error in *State* v. *Lutz,* 85 W. Va. 335. But, counsel for defendant contend that the accused in a felony case is entitled as a matter of right to a panel of twenty, without exception. *State* v. *Dushman,* 79 W. Va. 747, is cited in support of this proposition. That was a case where the juror offered was disqualified by reason of interest. The court properly said: "The defendant had the right to a panel of twenty from which to strike—all twenty impartial men." The court there laid down the true rule that under section 3, chapter 159, Code, 1913, one accused of a felony is entitled as a matter of right to a panel of twenty jurors, unexceptionably under the rules of the common law. To show that this rule cannot be invoked here, we may say that at common law the principal causes of challenges, *prima facie* disqualifying jurors, were: (1) That he was related to either party within the ninth degree; (2) that he was arbitrator on either side; (3) that he has an interest in the case; (4) that there is an action pending between him and the party; (5) that he has taken money for his verdict; (6) that he was for-

merly a juror in the same case; (7) that he is the party's master, servant, counsellor, steward, or attorney, or of the same society or corporation with him; and causes of the same class or founded upon the same reason are included. Thus we see that the polar star of disqualification is whether the juror is biased or prejudiced against the prisoner. No claim is made here that such was the case. While the court would have been justified in standing the juror aside, in the absence of bias or prejudice shown, it was not error to allow him to remain in the panel. Nor is there merit in the objection to juror Mayhew. It is claimed he was not a resident of Mingo county, having moved over the river to the Kentucky side about three weeks prior to the trial. He was recalled and examined by the court as follows: "Q. Are you a registered voter here? A. I am. Q. You claim West Virginia as your residence? A. Yes, sir. * * * Q. I mean you claim the city of Williamson, West Virginia, as your residence? A. Yes, sir." A change of residence or domicile depends upon intention. And, it is said that intention is the fundamental and controlling element. 19 C. J. 405.

"After a jury in a case of felony is impaneled and sworn, they shall be kept together and furnished with suitable board and lodging by the sheriff or other officer until they agree upon a verdict, or are discharged by the court." Code, chapter 159, sec. 6. It has been held that such officer need not be sworn to perform this duty, instructions to this effect by the court being sufficient. *State* v. *Hoke*, 76 W. Va. 36. However, in the case here the jury was committed to the custody of two deputy sheriffs, Jno. S. Hall and W. D. Driver, who were sworn each day to perform this duty. The only ground urged against the action of the court in committing the jurors to the custody of the sheriff was the fact that an injunction had theretofore been awarded against the sheriff inhibiting him from permitting Levi Layne to be taken out and questioned by the state police, as heretofore adverted to. We have already disposed of the charge in the defendant's petition for a change of venue that the sheriff had circulated false reports over the county to his detriment. There is nothing in this record to show that deputies Hall and Driver were

in any way incapacitated from performing the duty enjoined upon them by the court. Counsel for the prisoner, in their brief, frankly state that they are unable to call the attention of the court to any specific act on the part of the sheriff or his deputies in the keeping of the jury to the prejudice of the defendant. We have held that it is no disqualification of a sheriff to take charge of a jury in a felony case that he is a witness for or against the prisoner. *State* v. *Shores,* 31 W. Va. 491. This court will not review the action of the trial court where the statute, in plain and unambiguous terms, confers a power upon it, unless it affirmatively appears from the record that there was an abuse of such power as denied the defendant a fair and impartial trial. *Armstrong* v. *State of Okla.,* 2 Okla. Cr. 567; 24 L. R. A. (N. S.) 776.

Another ground of error assigned is that jurors Noah Wellman and Owen Fields had expressed opinions inimical to the prisoner prior to their qualification as such. The jurors named deny such charge. This is not a new question in this State. This Court said in *State* v. *Maier,* 36 W. Va. 763: "If the testimony of jurors, given under oath, will not be received to impeach their verdict, [and such is the law] for a stronger reason the unsworn, ill-considered, and thoughtless statements of jurors, made to third persons, should not be so received." This Court has repeatedly held to this effect. *State* v. *Porter,* 98 W. Va. 399; *State* v. *Greer,* 22 W. Va. 800; *State* v. *McDonald,* 9 W. Va. 456.

We now come to a consideration of the instructions. The court gave fourteen instructions asked for by the defendant. They embraced the question of reasonable doubt, circumstantial evidence, weight of testimony, and necessity of unanimity of the verdict. They were instructed that if they entertained any reasonable doubt as to whether the deceased was murdered or not, they must acquit. *State* v. *Ice,* 34 W. Va. 251. That unless they believed beyond a reasonable doubt that the defendant killed her, and that the deceased did not kill herself or come to her death by violence at the hands of some person other than the defendant, or that her death did not result from natural cause or causes, they could not convict. *State* v. *Kerns,* 47 W. Va. 270. That where the State relies upon

a conviction upon circumstantial evidence, it is essential that all the circumstances from which the conclusion is drawn shall be established by full proof; that every single circumstance which is essential to the conclusion must be proven in the same manner and to the same extent as if the whole issue had rested upon the proof of each individual and essential circumstance; and that such evidence is always insufficient when, assuming all to be true which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests circumstances with the force of proof. *State* v. *Allen,* 45 W. Va. 65. Several deal with other phases of circumstantial evidence. Of instructions refused, Nos. 2, 13, 14, 15, 21 and 22 relate to reasonable doubt, and the principles enunciated are substantially embodied in instructions given. Instructions Nos. 8 and 11 relate to circumstantial evidence and likewise are covered by the given charge. The remaining Instruction No. 16 deals with the principle of law that where there is a reasonable doubt as to which of two persons committed a crime, where two or more persons, including defendant, had the same opportunity to commit it, the jury should refuse to convict the defendant. This principle is stated in another part of the charge delivered to the jury, as we have shown. Instructions must be considered together as a whole, and if one instruction has been given fully covering a principle of law applicable to the case, it is not error to refuse other instructions to the same effect, although differently expressed. *State* v. *Owens,* 96 W. Va. 309; *State* v. *Driver,* 88 W. Va. 479.

The State submitted three instructions. The first merely told the jury the different verdicts that might be returned under the indictment, which is in the form provided by statute. The second instructs the jury that a person may be convicted of murder upon evidence which is wholly circumstantial in its nature, if all the evidence before the jury in the case be such as to convince them of the guilt of the defendant beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis. We perceive no error in the giving of either. By State's Instruction No. 3, the jury were told in effect that murder in the commission of or attempt to

commit rape is murder in the first degree. Therefore they were instructed that if they believed from all the evidence in the case beyond a reasonable doubt that the deceased came to her death as a result of an injury or injuries inflicted upon her by the defendant, or by defendant and Levi Layne, or by either of them, while they were acting together and in concert in committing or attempting to commit the act of rape upon the person of the deceased, then the defendant was guilty of murder in the first degree. There is no claim that the instruction does not correctly state the law, but the objection urged by counsel for defendant is that there was no evidence to support it. Minnie Layne, wife of Levi Layne, Maudie Layne, his daughter, and Pricey Sloan, the servant in the Layne home, all testify to the acts of Layne and Beale with the deceased under the grape-arbor, and that during such time Beale had his hand over her mouth. All who testify in the case agree that the deceased was helpless throughout the entire evening, both physically and mentally, due to the effect of liquor taken by her. Any intercourse with her while in such condition would amount in law to rape, for where the woman is in such a mental condition as to be incapable of consenting or exercising her will, it is so. 3 Cyc. 1445.

The undertaker and physician testify to two blood clots on the brain of the deceased, one upon her temple and the other in the right mastoid region, either of which could have produced death. Under our decisions, the *corpus delicti* consists in cases of felonious homicides, of two fundamental facts—*First*, the death; and, *second*, the existence of criminal agency as the cause thereof. The former must be proven, either by direct testimony or by presumptive evidence of the strongest kind; but the latter may be established by circumstantial evidence, or by presumptive reasoning upon the facts and circumstances of the case. *Pitts* v. *State*, 43 Miss. 472; *People* v. *Bennett*, 49 N. Y. 137. The death is established as an indubitable fact. The remaining question is, Who inflicted the injuries? The three women who were prepared for bed state that Levi Layne, in his night clothes, and the defendant, were out under the grape-arbor assaulting a helpless woman weighing only 105 pounds, and subduing and

suppressing her cries by placing a hand (the defendant's) over her mouth and throat, the relative positions of the parties indicating an attempt to, or the perpetration of the most horrible crime known to criminal jurisprudence. Layne then came in and went to bed. Beale was left out in the yard with the deceased. Sometime later he is heard to call for Layne to come out, that the woman was "gone", "dead" or "words to that effect". No more scuffling was heard by the three women in the house. All was silence out there. Where was the deceased now? Beale was the last person admittedly with her. He came in the house in about two hours to secure the aid of the drunken husband of the deceased in searching for deceased. It was the prisoner who suggested looking in the river. Why? She was dead before her body was committed to the river, says the evidence. What caused her death? What motive for her death? Beale could have killed her in her resistance; or killed her to cover up the crime after accomplishing his purpose. He never came back into the Layne home that night. He did not eat the next morning and admonished the members of the family not to tell what happened the night before. The fact that the body could not have floated down the river, and that it may have been concealed asks the question of the object of concealing the same. No other person could have had any object of concealing the body, except Beale, and that because he was the last person seen with the deceased. Was it a guilty conscience that forced from him the remark to Layne next day while neighbors were looking for the missing woman, "It looks bad for us to work, and those other people down there looking for her"? The law does not require direct proof of the killing, nor prescribe any positive or exclusive mode of proof, but admits individual or presumptive evidence to prove the crime, with the admonitory caution, however, that it must be weighed with scrupulous circumspection. It may be proved either by direct proof or by strong and unequivocal circumstances which render its commission morally certain. The jury was told this by the court. If, on a trial for murder, the evidence is wholly circumstantial, but as to time, place, motive, means, and conduct it concurs in pointing to the accused as the per-

petrator of the crime, he may properly be convicted. *Dean v. Commonwealth,* 32 Gratt. 912. Circumstances preceding the act, contemporaneous circumstances, and subsequent circumstances tend to so connect the accused here. The evidence in a homicide case being sufficient to warrant the submission of the case to the jury, prevents reversal on the ground of the verdict being against the weight of the evidence. *Imperio* v. *State,* 153 Wis. 455; *Lewis* v. *Commonwealth,* 29 Ky. Law Rep. 820. Or, in other words, we are limited on review of the evidence to the inquiry whether competent evidence to sustain a conviction was presented to the jury. *Commonwealth* v. *Harris,* 237 Pa. 597. The facts as developed upon the trial appreciably tend to support the conclusion reached by the jury. That another conclusion might have been reached therefrom is not for us to consider. The jury is the final arbiter in such cases.

We have carefully examined the record, and have given the case the careful consideration which its importance and its awful consequences to the defendant demand. We find no error therein justifying a reversal. A jury of the vicinage has pronounced him guilty of the highest offense known to the law. So much were they impressed with his guilt that although given the right under the law to limit the punishment to imprisonment for life, they have said that he has forfeited his life, and that the stern but just penalty of the law must be enforced upon him to that end. A just judge has sanctioned that verdict by pronouncing judgment in accord therewith. Solemn as is this judgment, for the reasons stated, we are compelled to affirm it.

As the day fixed for the execution of the judgment and sentence has passed, the case is remanded to the circuit court of Mingo county that proper action may be taken to have its sentence carried into execution as directed by law.

*Affirmed.*

HATCHER, JUDGE, *(dissenting):*

To my mind the evidence does not satisfactorily establish the *corpus delicti* if the accused be given the reasonable

doubts to which he is entitled. I therefore respectfully
dissent.

LIVELY, JUDGE, *(dissenting)*:

I regret that I cannot concur with the majority in the fore-
going opinion. This is my third dissent in seven years ser-
vice on the bench. As I grow older and note the fallibility
of my own judgment and conclusions, I give more considera-
tion and weight to the judgment of others, and therefore have
not been quick to dissent (a regrettable tendency in many
judges) from the conclusions of others more capable; but the
grave results here involved impel me to clear my conscience
of this man's blood.

I hold that a change of venue should have been awarded.
The crime, if one was committed, occurred May 9, 1926. The
trial was had at the following July term and sentence pro-
nounced July 28, 1926. The newspapers were full of the
sordid affair. The people were righteously indignant. Many
arrests were made. The sheriff's force aided by state police
were active in trying to discover the supposed perpetrator
to such an extent that injunctive power of a court of chancery
was successfully invoked to prevent them from continuing
"third degree" methods to extract confession or damaging
evidence from Layne, at whose home the debauchery occurred.
The people of the city of Williamson, which contains one-
third of the entire population of the county, as well as those
outside, knew these facts from the public press, and the
matter was a general conversation and comment. A. R.
Stepp, 44 years old, chief of police of the city, and who was
born, reared and always lived in the county, and who did not
know defendant, and had no interest in the case, swears that
he is thrown in daily contact with the people of the city and
a majority of those in the county, and that he had heard the
case discussed by them; that the reports were that Layne and
Beale had raped, murdered and thrown into the river Rissie
Perdue, and that from expressions made by the people in
relation thereto he swears that he is of the opinion that Beale
cannot get a fair trial in the county. The point is made in

the opinion that the expressions he had heard were not set out in the affidavit. It is true that he does not say that the expressions were that "they should be hanged, or lynched", or anything of like character, but the fact remains that the talk impelled him to state on oath that defendant could not get a fair trial. The petition for change of venue supplemented by Stepp's affidavit was demurred to by the State at the court's suggestion, and the demurrer sustained. The facts therein stated are not controverted. They are to be taken as true as well as all inferences reasonably to be drawn therefrom. Can it be inferred from Stepp's affidavit that the expressions which he heard generally from a majority of the people were not inimical to a fair trial? The State did not attempt in any way to controvert the affidavit or the facts set out in the petition. They remain unchallenged except by demurrer. The great body of the jurors empaneled came from the city. It is apparent to me that the inflamed feeling against the prisoner in the county had not subsided. The mob cry of "an eye for an eye" had not subsided. The short time between the commission of the supposed crime and the trial, played up in gruesome details by the press, and kept alive by questionable "third degree" methods, was not sufficient to enable a return to that calm temperament and judgment which should always be present at a trial where human life is involved. There was not sufficient cooling time. The psychological influence of public opinion upon a jury is well recognized. It reaches a jury unperceived. It was stated in argument that Layne, co-defendant with Beale, had, upon the same petition and evidence, been granted a change of venue, and had been tried in another county and acquitted. This record shows that he was as culpable, if not more so, than Beale. This fact of acquittal is of some significance on the point under discussion.

A word on the sufficiency of the evidence. Granting that the evidence is sufficient to prove the *corpus delicti* (and it is not conclusive to my mind under the evidence of the physician who conducted a post mortem), the criminal agency of defendant has not been shown to the exclusion of every other reasonable hypothesis. It is said that defendant was

the last person seen with her and he had called out that she was dying and for some one to come. This exclamation, if true, does not import that he was killing her or had killed her. The witnesses were not impressed sufficiently to respond to the cry for help. The deceased had been acting strangely and making outcries of an unusual character all afternoon. Under the well known rule of circumstantial evidence, it is essential that the circumstances proved must be not only consistent with the hypothesis of the guilt of the accused, but it is essential that the circumstances should to a moral certainty exclude every hypothesis but that of the guilt of the accused.

The evidence does not meet that requirement. *State* v. *Flanagan,* 26 W. Va. 122; *State* v. *Bennett,* 93 W. Va. 548; *State* v. *Dudley,* 96 W. Va. 481; *State* v. *Roush,* 95 W. Va. 132; *State* v. *Gilfillen,* 96 W. Va. 660; *State* v. *Hunter,* 103 W. Va. 377. Judge LITZ concisely stated the law in *State* v. *Bennett, supra,* as follows: ''To convict on circumstantial evidence alone, it should to a moral certainty exclude every other hypothesis but that of guilt; and circumstantial evidence should always be scanned with caution.''