**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


**State of West Virginia,**
**Petitioner Below, Respondent**

**vs.) No. 19-0864** (Cabell County 17-F-466)

**Anthony Scott Adkins,**
**Defendant Below, Petitioner**


**MEMORANDUM DECISION**


Petitioner Anthony Scott Adkins, by counsel Kerry A. Nessel and Todd Meadows, appeals the September 13, 2019, order of the Circuit Court of Cabell County sentencing him to a term of life imprisonment without the possibility of parole following his conviction of first-degree murder. The State of West Virginia, by counsel Patrick Morrisey and Benjamin F. Yancey III, filed a response in support of the circuit court's order, to which petitioner replied.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On May 4, 2017, Doug Daniels was found dead on the bank of the Guyandotte River. Petitioner was arrested on suspicion of murder later that evening. In October of 2017, petitioner was indicted on one count of first-degree murder. Petitioner's jury trial began in July of 2018. At the outset of the proceedings, petitioner moved to bifurcate the guilt and penalty phases of the proceedings, and that motion was granted.

At trial, eyewitness Brandi Lovins testified that, on May 4, 2017, she accompanied Zac Lawhon as he fished on the bank of the river. Ms. Lovins witnessed an altercation between three men on the opposite riverbank. The men were later identified as petitioner, Joey Vernatter, and Doug Daniels. Ms. Lovins witnessed petitioner throw a punch at Mr. Daniels, then Mr. Vernatter throw a punch at Mr. Daniels, and Mr. Daniels collapsed to the ground. Ms. Lovins watched as

1

petitioner and Mr. Vernatter continued to strike Mr. Daniels while he was on the ground. She believed that petitioner and Mr. Vernatter punched Mr. Daniels thirty to thirty-five times each. Then, she observed petitioner kick Mr. Daniels, and Mr. Vernatter kicked him as well. She testified that each man landed fifteen kicks on Mr. Daniels, while he was on the ground. Mr. Lawhon also witnessed both men punch and kick Mr. Daniels multiple times after he was on the ground.

After this initial flurry of punches and kicks, petitioner shoved Mr. Vernatter away from Mr. Daniels, and Ms. Lovins heard petitioner say, "That's enough. Let's go." Petitioner grabbed a backpack and went up the hill and started to cross the bridge over the Guyandotte River. Mr. Vernatter stayed on the riverbank. By this point, Mr. Lawhon left Ms. Lovins and was crossing the bridge toward the scene of the crime when he passed petitioner walking across the bridge. As Mr. Lawhon finished crossing the bridge, Mr. Lawhon believed that he could see Mr. Daniels still breathing, "not, like, real hard but just a little bit." Mr. Lawhon testified that he saw Mr. Vernatter pick up a large rock and hit Mr. Daniels three times in the head. While striking him, Mr. Lawhon heard Mr. Vernatter telling Mr. Daniels, "Die. Die. Go to sleep" and heard Mr. Vernatter calling Mr. Daniels "horrible" names. Mr. Lawhon returned to Ms. Lovins and called the police. Neither Ms. Lovins nor Mr. Lawhon saw Mr. Daniels get up after he was knocked to the ground. The police responded and discovered that Mr. Daniels was deceased.[1]

Following the incident, petitioner had contact with multiple acquaintances who later testified at trial. Christopher McCallister testified that he messaged petitioner on the night of the murder. Mr. McCallister stated that petitioner told him that he and Mr. Vernatter had gotten into a fight with Mr. Daniels, and petitioner stated that he hit Mr. Daniels over the head with a rock and then stomped on him. According to Mr. McCallister, petitioner stated that he and Mr. Vernatter had killed Mr. Daniels and that Mr. Vernatter would not leave when petitioner left. Petitioner also spent time that evening with his girlfriend, Sarah Fitzwater, and her friend, Cheryl Thomas. After leaving the riverbank, petitioner called Ms. Fitzwater and asked her to pick him up at a gas station. Ms. Thomas, a co-worker of Ms. Fitzwater, had agreed to give Ms. Fitzwater a ride to the hospital to receive treatment for an ankle injury, and she waited with Ms. Fitzwater for petitioner to arrive at the gas station.

Ms. Fitzwater testified that when petitioner arrived, he had "blood or mud mixed all over his pants and he had it smeared on his forearm," and she believed it was the type of blood that could occur from a fistfight. Ms. Fitzwater also noted that petitioner was drunk when he arrived. Ms. Fitzwater refused to touch petitioner's hand because of the blood. The trio drove to the hospital so that Ms. Fitzwater could receive treatment for her ankle. She testified that petitioner typically kept a change of clothes in his backpack and that he changed as soon as he arrived at the hospital. Ms. Fitzwater testified that petitioner stated he never hit Mr. Daniels with a rock. She asked petitioner whether he killed Mr. Daniels, and he stated that he did not know. Later in the

---

[1]Mr. Vernatter fled the scene when the police arrived. He reportedly jumped into the Guyandotte River, refused to come ashore, and, ultimately, drowned in the river.

evening, Ms. Fitzwater called Ms. Thomas and asked her to call the police and inform them of what petitioner had said. Following Ms. Fitzwater's testimony, the State played her recorded interview with police, which was taken the day after the alleged murder. In the recorded statement, Ms. Fitzwater said that petitioner had told her that he hit Mr. Daniels in the back of the head with a rock:

> [H]e just pretty much spilled it all out. Him and Joey and this guy were down there drinking. Apparently Joey and this guy got into it and had words. The guy pushed Joey. [Petitioner] come from behind, he was standing behind him, he said he picked up this big huge like rock and hit the guy over the back of the head and the guy went down. [Petitioner] said he kicked him in the face and him and Joey jumped on top of [Mr. Daniels] and just kept kicking him and hitting him.

Next, Ms. Thomas testified that petitioner had "splatters" of "blood on his hands and his tennis shoes" and some on his face and chest when he arrived at the gas station. She explained that petitioner was drunk and "erratic, talking so fast that you couldn't really make out a whole lot." However, Ms. Thomas testified that petitioner stated to Ms. Fitzwater, "[y]our ex is going to get the same thing. Your ex is going to get the same thing. All it takes is a rock, Sara[h]. All it takes is a rock." Ms. Thomas testified that she mentioned to petitioner that he looked like he had been in a fight, and he responded, "[w]ell yeah. The guy was running his mouth. He won't be doing that again." According to Ms. Thomas, petitioner also mentioned striking the man with a brick. After Ms. Thomas dropped petitioner and Ms. Fitzwater off at the hospital, she went home. She testified that she saw a news report that Mr. Daniels had been found dead on the riverbank and messaged Ms. Fitzwater with concern that petitioner was involved. Ms. Fitzwater responded that she was scared and asked Ms. Thomas to call 911, which she did.

The State called Dr. Allen Mock of the State Medical Examiner's Office, who performed Mr. Daniels's autopsy, to testify. Prior to trial, petitioner was provided Dr. Mock's autopsy report. Dr. Mock concluded in his report that Mr. Daniels died "as the result of blunt force injuries of the head, having been assaulted by another(s) [sic] wielding a blunt object." At trial, Dr. Mock testified that Mr. Daniels suffered numerous lacerations to the face, some abrasions to the face, and "palpable bony fractures" in the face. Dr. Mock observed that Mr. Daniels suffered catastrophic brain injuries, including multiple contusions, "bruises of the actual brain itself," bleeding under the scalp and under the skull, bleeding around the brain, and significantly, a laceration of the brainstem, otherwise described as a "pontomedullary junction tear."

Regarding the cause of death, Dr. Mock opined at trial that Mr. Daniels died as "a result of blunt force injuries to the head, having been assaulted by another or anothers [sic] wielding a blunt instrument." Dr. Mock explained that blunt force injuries occur "when the body is impacted or impacts an object. [They are] called blunt force to distinguish them from sharp force injuries, which could be a cut or a stab." He further explained that blunt force injuries could occur from a punch or a kick and that the phrase "wielding a blunt object," as used in his report and his opinion, meant "using something to inflict a blunt force injury." Dr. Mock clarified that a person could "wield" their hand or foot to cause blunt force injuries. He further testified that Mr. Daniels could have been killed by being punched or kicked in the head. Dr. Mock explained that he could not

3

determine which specific injury was fatal for Mr. Daniels. He testified that many of Mr. Daniels's injuries could have caused his death, but the pontomedullary junction[2] tear would have ended his life, as such a tear results in "immediate death." Dr. Mock explained that a pontomedullary junction tear could have occurred as a result of being punched or kicked, although he testified that it would be an "atypical" result. Finally, Dr. Mock testified that there was no evidence that Mr. Daniels suffered any injuries to the back of his head.

Finally, the State called Lt. David Castle of the Huntington Police Department, who conducted a blood pattern analysis of the blood found at the crime scene, on Mr. Daniels's clothing, and on petitioner's clothing. Lt. Castle authored a report on his findings and conclusions, which was provided to petitioner the day prior to trial. In the report, Lt. Castle made multiple conclusions, including: Mr. Daniels's injuries were a result of blunt force; Mr. Daniels either moved or was moved at least three times after bloodshed began; Mr. Daniels was beaten while he was on the ground; petitioner came into contact with wet blood while in a kneeling position, either through contact with Mr. Daniels's head or the grass; the top of petitioner's right shoe came into contact with wet blood, either through contact with Mr. Daniels's head or a stain on the ground; and petitioner was in close proximity to Mr. Daniels as the impacts were administered.

At trial, Lt. Castle explained his conclusions were based upon multiple blood stains on petitioner's clothing. For instance, petitioner's pants exhibited transfer, saturation, and impact spatter stains. Lt. Castle identified transfer and saturation stains on petitioner's right shoe. Lt. Castle also testified that he used the term "blunt force" to mean an injury caused by a blunt object. He clarified that a hand and foot would both be considered blunt objects that could cause blunt force injuries. Lt. Castle testified that he "was able to deduce, based on the impact stains at the scene, that [Mr. Daniels] was beaten about the head and face in a position just like he was . . . when we found him. In other words, face up, but on the ground." Lt. Castle further testified "that [Mr. Daniels] had been bleeding prior to his final position and was in at least three different other places within about [ten] feet from where he was found, so he'd been moved at least three times while bleeding." He explained that Mr. Daniels could have been moved or moved on his own after the bleeding began. Due to an absence of drip staining on Mr. Daniels's person, Lt. Castle was able to conclude that Mr. Daniels never stood up after bloodshed began. Regarding the transfer stains, Lt. Castle testified that he could not determine how the blood was transferred to petitioner's pants and shoes, whether "through force or just through accidental contact." The State rested. Petitioner moved for a judgment of acquittal, which the circuit court denied.

Petitioner testified that he went to have a drink with Mr. Vernatter and Mr. Daniels on the riverbank on May 4, 2017.[3] Petitioner stated that the three of them had been hanging out and

---

[2]The "pontomedullary junction" was described as the "area in between your brain and the spinal cord" "between the pons and the medulla." Dr. Mock explained that this injury was a "laceration of the brainstem."

[3]In addition to his own testimony, petitioner presented the testimony of Zac Lawhon,

(continued . . .)

4

drinking liquor for a few hours when Mr. Vernatter and Mr. Daniels began arguing. Petitioner claimed that Mr. Daniels shoved Mr. Vernatter and that he separated the men. Petitioner testified that he answered a phone call after separating the men but could hear the arguing resume in the background. By the time petitioner finished his phone call, he turned to see Mr. Daniels on the ground, and testified that he believed Mr. Vernatter had struck Mr. Daniels. Petitioner testified that Mr. Daniels regained his footing and then swung at petitioner as he approached the men. Petitioner stated that he dodged the attack and shoved Mr. Daniels to the ground.[4] According to petitioner, Mr. Vernatter approached Mr. Daniels before he could stand up and began kicking him in the face. Petitioner stated that Mr. Vernatter landed three or four kicks before he intervened, telling Mr. Vernatter to "stop" and, ultimately, pushing Mr. Vernatter to the ground. Petitioner then testified that he knelt on both knees at Mr. Daniels's side, cradled his head, asked him questions, and could hear him mumbling in response. Petitioner testified that he stood before Mr. Vernatter landed a running kick on Mr. Daniels's face. Petitioner suspected that this kick caused the blood splatter on his pants. Petitioner attempted to stop Mr. Vernatter one last time, yet Mr. Vernatter refused to cease his renewed attack. Finally, petitioner decided to leave. He clarified that he did not punch or kick Mr. Daniels at any point.

On cross-examination, petitioner was confronted with a statement he provided to police after his arrest on May 4, 2017. During the statement, petitioner asserted that he did not touch Mr. Daniels, but later admitted to hitting Mr. Daniels one time. Petitioner asserted that he was drunk during the interview but acknowledged that he had not had any alcohol for six hours leading up to the interview. Petitioner also denied that he told Ms. Fitzwater or Mr. McCallister that he hit Mr. Daniels. Petitioner characterized Ms. Fitzwater as "a habitual liar." Petitioner testified that he had some blood on his person from attempting to help Mr. Daniels, but denied that he was covered with blood, or that he had blood on his chest as Ms. Thomas described.

The State called one rebuttal witness, Lt. Castle, who testified that he witnessed petitioner's testimony. Lt. Castle testified that the blood splatter on petitioner's pants would not be consistent with being near Mr. Daniels when Mr. Vernatter kicked him in the face. He explained that there were multiple impact stains on petitioner's pants and no impact splatters between the stains. Based on the stains, Lt. Castle testified that the two impact stains were not caused by blood splatter from a single strike, as petitioner asserted during his testimony.

Following the parties' closing arguments, the jury found petitioner guilty of the first-degree murder of Mr. Daniels. The jury later considered whether to grant petitioner mercy and declined. Thereafter, the circuit court sentenced petitioner to incarceration for life without the possibility of parole. In September of 2018, petitioner filed a motion for judgment of acquittal,

which is set forth above.

[4]At this point in petitioner's testimony, the circuit court took a brief recess. Before resuming the testimony, the State moved to allow Lt. Castle to observe the remainder of petitioner's testimony for the purposes of rebuttal, which the court granted.

which the circuit court denied. Petitioner appeals the circuit court's September 13, 2019, order sentencing petitioner to incarceration for life without the possibility of parole.

On appeal, petitioner first argues that the circuit court erred in denying his motions for judgment of acquittal because he was "ambushed" by discoverable evidence at trial. Petitioner's argument centers on the expert testimony of Dr. Mock and Lt. Castle. Petitioner asserts that Dr. Mock's report (provided before trial) and his trial testimony differed substantially. Petitioner argues that Dr. Mock's report provided that Mr. Daniels died "as the result of blunt force injuries of the head, having been assaulted by another(s) [sic] wielding a blunt object," whereas Dr. Mock's trial testimony and opinion was that Mr. Daniels could have died as a result of being punched or kicked in the head. According to petitioner, Dr. Mock's use of the word "wield" is misleading as a person cannot "wield" their own fist or foot. Petitioner considered this testimony an "amended medical opinion" that should have been disclosed prior to trial but was not unveiled until Dr. Mock's testimony was offered. Regarding Lt. Castle's testimony, petitioner emphasizes that his expert report was not provided until one day before trial. In conclusion, petitioner argues that he would have obtained expert testimony to contradict the State's expert opinions that hands and feet could be considered "blunt force objects" as presented at trial.

The State argues that petitioner has mischaracterized the proceedings below. According to the State, the experts' testimony simply provided more details as to their opinions. Their opinions that Mr. Daniels died as the result of blunt force trauma was unchanged, and the alleged error occurs from petitioner's interpretation of the experts' reports. Further, the State argues that petitioner did not object to the evidence at any time, nor did he move for a continuance, which undermines his argument that he was, in fact, surprised by the evidence produced at trial. Finally, the State argues that it produced evidence that petitioner struck Mr. Daniels in the head with a rock, which is consistent with petitioner's interpretation of the experts' reports.

Upon our review, we agree with the State that petitioner failed to object to this testimony below, and this failure is fatal to his argument on appeal. As we have previously held, "a defendant who has not proffered a particular claim or defense in the trial court may not unveil it on appeal." *State v. Miller*, 197 W. Va. 588, 597, 476 S.E.2d 535, 544 (1996). "To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 216, 470 S.E.2d 162, 170 (1996). *See also State v. Benny W.*, 242 W. Va. 618, 629, 837 S.E.2d 679, 690 (2019) ("We have long held that we will not consider assignments of error . . . which might have been remedied by the circuit court upon proper objection.") (internal quotation omitted). In this instance, petitioner did not alert the circuit court to the alleged discovery violation when the evidence was introduced at trial. Accordingly, we find that petitioner has waived his opportunity to present this argument on appeal.

Second, petitioner argues that the State utilized perjured testimony from Ms. Fitzwater and Dr. Mock. During Ms. Fitzwater's recorded statement, which was played for the jury after her testimony, she asserted that petitioner "said he picked up this big[,] huge like rock and hit the guy

over the back of the head and the guy went down. [Petitioner] said he kicked him in the face and him and Mr. Vernatter jumped on top of [Mr. Daniels] and just kept kicking him and hitting him." Petitioner argues that this statement was perjured and prejudicial because it was not supported by Dr. Mock's testimony that there was no evidence of any injury to the back of Mr. Daniels's head. Further, petitioner argues that Dr. Mock's testimony "that a punch from [petitioner] may have split the victim's skull was simply false testimony under the facts of the case." The State responds that Ms. Fitzwater's recorded statement was used for impeachment purposes. Additionally, the State argues that Dr. Mock testified that Mr. Daniels could have died as a result of being punched and kicked in the head, which is not incredible. We find petitioner is entitled to no relief.

> "A witness can be impeached by statements made by [her] out of court only when such statements are contradictory to [her] testimony. If there is no substantial variance between such statements and [her] testimony, statements cannot be introduced for purposes of impeachment." Syllabus point 19 of *State v. Price*, 92 W.Va. 554, 115 S.E. 393 (1922).

Syl. Pt. 1, *State v. Stewart*, 161 W. Va. 127, 239 S.E.2d 777 (1977). Further, Rule 613(b) of the West Virginia Rules of Evidence provides that "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."

First, we find no error in the State's use of Ms. Fitzwater's recorded statement. During her testimony, she denied making multiple statements to investigators during a recorded interview, including denying that petitioner told her that he hit Mr. Daniels in the back of the head with a rock. This is clearly a substantial variance between her trial testimony and her out of court statement. Further, Ms. Fitzwater was confronted with a transcript of her prior statement during her testimony and given an opportunity to explain or deny the prior statement. Thus, there was no error in the State utilizing her recorded statement to impeach her.

Petitioner relies on this Court's holding in *State v. Collins*, 186 W. Va. 1, 409 S.E.2d 181 (1990), wherein the State relied upon a witness's extrinsic statement as "substantive evidence rather than mere impeachment material." *Id*. at 11, 409 S.E.2d at 191. In *Collins*, we considered that "the State had no other evidence which directly bore on the defendant's guilt" and the prosecutor "referred to [the witness's] prior inconsistent statements on several occasions during closing argument." *Id*. We found that this "compound[ed] the impeachment error." The case at hand is distinguishable in that the State did not refer to Ms. Fitzwater's statement as substantive evidence. The State did not refer to the statement during closing, and, moreover, the State had significant eyewitness testimony that implicated petitioner in the murder of Mr. Daniels. Accordingly, we find *Collins* unpersuasive in this instance.

In regard to petitioner's claims that Dr. Mock's testimony was perjured, we also disagree. Contrary to petitioner's assertions on appeal, Dr. Mock did not testify that petitioner split the victim's skull with his hands or feet. Rather, Dr. Mock testified that Mr. Daniels sustained multiple injuries and he could not determine which of them constituted the fatal blow. However, Dr. Mock testified that the pontomedullary junction tear would have been fatal had Mr. Daniels been alive

when it occurred. According to Dr. Mock, this tear could have been caused by a kick to the head at a certain angle. Petitioner wrongly argues on appeal that Mr. Vernatter's crushing of Mr. Daniels's skull with a rock was the certain, sole cause of death, an assertion that is not supported by the evidence.

To the extent that petitioner's assertion that these witnesses introduced perjured testimony because of the inconsistencies in their respective statements, we have held "[i]t [is] the role of the jury to weigh the evidence and make credibility assessments after it observed the witnesses and heard their testimony. The jury made its determination, and this Court will not second guess it simply because we may have assessed the credibility of the witnesses differently." *State ex rel. Franklin v. McBride*, 226 W. Va. 375, 381, 701 S.E.2d 97, 103 (2009) (quoting *State v. Brown*, 210 W. Va. 14, 552 S.E.2d 390 (2001)). "Only when testimony is so unbelievable on its face that it defies physical laws should the court intervene and declare it incredible as a matter of law." Syl. Pt. 8, *State v. Smith*, 178 W. Va. 104, 358 S.E.2d 188 (1987). We find no cause to disturb the jury's credibility determinations in this case.

Next, petitioner argues that the State failed to prove the corpus delicti of murder beyond a reasonable doubt. With regard to a challenge of the sufficiency of evidence, we have held that "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Further,

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id*. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part.

> "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case." Point 6 Syllabus, *State v. Beale*, 104 W.Va. 617, 141 S.E. 7, 141 S.E. 401.

8

Syl. Pt. 1, *State v. Durham*, 156 W. Va. 509, 195 S.E.2d 144 (1973). "In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death indirectly through a chain of natural causes." Syl. Pt. 5, *State v. Surbaugh*, 237 W. Va. 242, 786 S.E.2d 601 (2016) (internal citation omitted). Critical to petitioner's argument,

> "[i]f, after a mortal wound has been inflicted upon a person and while he is still living, a second injury is inflicted upon him, and he subsequently dies from the effects of both, the first one contributing to the death, the perpetrator of the first injurious act is not exonerated from the charge of homicide[ ] by the perpetration of the second." Syl. Pt. 8, *State v. Snider,* 81 W.Va. 522, 94 S.E. 981 (1918).

*Id*. at 242, 786 S.E.2d at 606, syl. pt. 7. "To effect such exoneration the intervening injury must have been the proximate cause of the death." *Id*, syl. pt. 8.

Petitioner asserts that Dr. Mock testified to three competing causes of death: 1) Mr. Daniels "bled out" and died of exsanguination; 2) the initial flurry of strikes causes a pontomedullary junction tear, which killed Mr. Daniels; or 3) Mr. Daniels died as the result of blunt force trauma by a person wielding a blunt object. Petitioner argues that through this testimony Dr. Mock introduced reasonable doubt as to whether his actions were the cause of Mr. Daniels's death. However, as testified to by two separate eyewitnesses, petitioner, along with Mr. Vernatter, struck Mr. Daniels repeatedly as he lay on the ground. One eyewitness estimated that both petitioner and Mr. Vernatter each landed thirty punches and fifteen kicks. Dr. Mock testified that Mr. Daniels died as a result of blunt force trauma, which could be caused by the punching and kicking in which petitioner and Mr. Vernatter engaged. Other evidence, such as the testimony of Mr. McCallister and Ms. Fitzwater, showed that petitioner admitted to hitting Mr. Daniels in the head with a rock as well. The evidence shows that petitioner and Mr. Vernatter could have inflicted mortal wounds upon Mr. Daniels while repeatedly punching and kicking him on the grounds. Thus, any subsequent mortal wounds inflicted by Mr. Vernatter alone does not exonerate petitioner. The evidence is sufficient to prove the existence of petitioner's criminal agency as a cause of Mr. Daniels's death. Thus, we find no error.

Finally, petitioner briefly argues that the circuit court erred in instructing the jury on an "aider and abettor" theory without giving his proposed corpus delicti instruction. This Court has held that

> A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Syl. Pt. 11, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). Notably, petitioner has failed to include the proposed jury instruction in the appendix record. Therefore, the Court cannot determine whether the proffered instruction was a correct statement of the law. Further, the circuit

court considered petitioner's instruction at the time and found that it was covered by other instructions and that petitioner's proposed instruction may have been confusing to the jury. Accordingly, we cannot find reversable error in this instance.

For the foregoing reasons, we find no error in the circuit court's September 13, 2019, order.

Affirmed.

**ISSUED**: October 13, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton