IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

No. 14-0890

**FILED**

**April 13, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

JULIA SURBAUGH,
Defendant Below, Petitioner.

Appeal from the Circuit Court of Webster County
Honorable Richard A. Facemire, Judge
Criminal Action No. 10-F-14

AFFIRMED

Submitted: February 24, 2016
Filed: April 13, 2016

Christopher G. Moffatt, Esq.
Charleston, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Jonathan E. Porter, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify." Syl. Pt. 5, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

2. "When a trial court is called upon to determine the admissibility of scientific expert testimony, in deciding the 'reliability' prong of admissibility the focus of the trial court's inquiry is limited to determining whether the expert employed a methodology that is recognized in the scientific community for rendering an opinion on the subject under consideration. If the methodology is recognized in the scientific community, the court should then determine whether the expert correctly applied the methodology to render his or her opinion. If these two factors are satisfied, and the testimony has been found to be relevant, and the expert is qualified, the expert may testify at trial." Syl. Pt. 2, *Harris v. CSX Transport, Inc.*, 232 W.Va. 617, 753 S.E.2d 275 (2013).

3. "Following a trial court's decision that a physician is qualified to offer expert testimony in a given field, issues that arise as to the physician's personal use of a specific technique or procedure to which he or she seeks to offer expert testimony go only to the weight to be attached to that testimony and not to its admissibility." Syl. Pt. 3, *Walker v. Sharma*, 221 W.Va. 559, 655 S.E.2d 775 (2007).

4. "'Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case.' Point 6 Syllabus, *State v. Beale*, 104 W.Va. 617[, 141 S.E. 7 (1927)]." Syl. Pt. 1, *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973).

5. "In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death indirectly through a chain of natural causes." Syl. Pt. 2, *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973).

6. "A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the wound or related to such treatment or effect of a preexisting physical disability of the victim." Syl. Pt. 3, *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973).

7. "If, after a mortal wound has been inflicted upon a person and while he is still living, a second injury is inflicted upon him, and he subsequently dies from the effects of both, the first one contributing to the death, the perpetrator of the first injurious act is not exonerated from the charge of homicide[] by the perpetration of the second." Syl. Pt. 8, *State v. Snider*, 81 W.Va. 522, 94 S.E. 981 (1918).

8. "To effect such exoneration the intervening injury must have been the proximate cause of the death." Syl. Pt. 9, *State v. Snider*, 81 W.Va. 522, 94 S.E. 981 (1918).

9. If a person inflicts a wound upon a person who thereafter dies, it is not a defense to a criminal homicide charge that medical care in the treatment of that wound contributed to the victim's death. Only medical care that is shown to be the sole cause of death will operate to break the chain of causation and relieve the defendant of criminal responsibility.

10. "When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction." Syl. Pt. 2, *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995).

11. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility

determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

12. "A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion." Syl. Pt. 4, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

13. "A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so

that the failure to give it seriously impairs a defendant's ability to effectively present a given

defense." Syl. Pt. 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

LOUGHRY, Justice:

The petitioner herein and defendant below, Julia Surbaugh, appeals the July 14, 2014, amended order of the Circuit Court of Webster County denying her motions for a new trial or for judgment of acquittal subsequent to her jury conviction of murder in the first degree without a recommendation of mercy.[1] She asserts multiple assignments of error: the circuit court erred by admitting expert opinion testimony from a deputy medical examiner; the State failed to prove the corpus delicti of murder; the circuit court erred by refusing to dismiss the case based upon the State's destruction of evidence; the State failed to present sufficient evidence to support the conviction; the circuit court erred in instructing the jury and by using an improper verdict form; and the circuit court erred in admitting the petitioner's statements to police.[2] After a thorough review of the record on appeal,[3] the parties' arguments, and the relevant law, we find no reversible error and affirm.

---

[1]This appeal arises from the petitioner's second trial, which was held in 2014. At the conclusion of a first trial in 2010, a jury found the petitioner guilty of first degree murder and did not recommend mercy. She appealed and in *State v. Surbaugh*, 230 W.Va. 212, 737 S.E.2d 240 (2012) (*Surbaugh I*), the Court reversed the conviction and remanded for a new trial on the sole basis of the trial court's failure to instruct the jury on the use of good character evidence.

[2]The petitioner's brief sets forth ten assignments of error; we have combined some of these alleged errors for purposes of discussion. Ms. Surbaugh, writing *pro se*, supplemented her lawyer's arguments.

[3]In addition to reviewing the appendix record filed by the petitioner, this Court directed the circuit clerk to submit for our review copies of the admitted trial exhibits, the jury instructions, and the verdict form. *See* R.A.P. 6(b) ("The Court, upon its own motion, may consider portions of the record other than those provided by the parties.").

1

## I. Factual and Procedural Background

On the morning of August 6, 2009, while inside the bedroom of his home, the victim Michael Surbaugh was shot three times in the head with a .22 caliber handgun. Two bullets entered and exited through the side of his face. Another bullet entered the other side of his head, fracturing the lateral wall of the maxillary sinus and the zygomatic arch. Bullet fragments were lodged inside the area of his sinus cavity, but none of the bullets penetrated the cranium into the brain. Two of the gunshots were fired from a distance of greater than eighteen inches, while the shot that penetrated his sinus cavity was a near-contact discharge.

At the time of the shooting, Mr. Surbaugh and his wife, the petitioner herein, were home alone.[4] The petitioner immediately called 911 to report that her husband had shot himself. She then told authorities that her husband tried to shoot her while they were lying in bed together, they struggled, and the gun accidentally discharged and struck him. Later, the petitioner changed her story again to assert that although her husband tried to shoot her while they were lying in bed together, she got the gun away from him and fired two shots at him in self-defense as he approached her in a threatening manner. As to the third gunshot wound he received, the petitioner claimed her husband took the gun back and fired the third shot at his own head. The petitioner testified that she believes she was screaming during this

---

[4]The Surbaughs had minor children, but the children, who had spent the prior night at a neighbor's home, had not yet returned.

2

encounter. However, a neighbor who heard the shootings did not hear any talking, screaming, or sounds of a struggle. The neighbor testified that he clearly heard a gunshot, a groan, a gunshot, a groan, and then, after a little hesitation, another gunshot.[5]

Although he was bleeding profusely, Mr. Surbaugh was able to walk and talk after being shot. With the assistance of another neighbor who arrived on the scene, Mr. Surbaugh went outside his home and sat in a lawn chair to await an ambulance. Using a cellular telephone, he contacted his extramarital girlfriend to tell her that he would be late for a trip they were planning to take later in the day. When emergency medical personnel arrived, Mr. Surbaugh stated "the bitch shot me," referencing the petitioner. A short time later at a local hospital, Mr. Surbaugh told medical personnel that he had been sleeping in his bed when he was awakened by a severe pain to his head that felt like a baseball bat hitting his skull. He told a physician's assistant, "I'm not crazy. I didn't do this. This bitch shot me." While at the hospital, in a recorded statement to the investigating police officer, Mr. Surbaugh said he was asleep in bed when he "felt like somebody hit me up beside the head with a baseball bat." Mr. Surbaugh also said he saw the petitioner with the gun, which he took away from her.

---

[5]At the time of the shooting, the neighbor had just exited his home and was on his sidewalk. The bedroom window of the Surbaughs' home faces this sidewalk.

Approximately four and one-half hours after the shooting, while he was being loaded onto a helicopter for emergency transit to a hospital with trauma facilities, Mr. Surbaugh went into cardiac arrest and died. After performing an autopsy, Deputy Medical Examiner Hamada Mahmoud concluded that the cause of death was the three gunshots to the head. Dr. Mahmoud also opined that the specific mechanism that led to the cardiac arrest was possibly an air embolism due to air entering the bloodstream through the damaged sinus cavity. At trial, the petitioner presented her own experts, Dr. Cyril Wecht and Dr. David Henchman, who opined that the cardiac arrest was caused by pulmonary edema resulting from the emergency medical personnel administering too much intravenous fluid while treating Mr. Surbaugh for the gunshot wounds. The petitioner's experts denied there was any evidence of an air embolism.

After her husband's death, the petitioner told a police officer that "I just want you to know I didn't do it because he was going to leave me. I did it because he was taking my kids." It is undisputed that the petitioner knew of her husband's extramarital affair, knew that he planned to leave that same day for a trip with his girlfriend, and knew that he was planning to leave the marital home to move in with his girlfriend. The petitioner testified that in the event of a marital separation, she was "terrified" her husband would get

4

unsupervised visitation with their children.[6] Moreover, she testified that the night before the shooting, her husband had threatened–for the first time–that he and his girlfriend would take the children away from her. According to the petitioner's testimony, her husband had never before threatened to fight her for custody or unsupervised visitation.

The State asserted at trial that the petitioner committed intentional, premeditated murder. In defense of that charge, the petitioner asserted that she fired two of the gunshots in self-defense and that her husband self-inflicted the third shot. She further asserted that medical negligence was the cause of her husband's death, not the gunshot wounds. At the conclusion of the twelve-day trial held in February and March of 2014, the jury found the petitioner guilty of first degree murder and did not recommend mercy. The petitioner filed a post-trial motion for new trial or judgment of acquittal, which the circuit court denied by amended order entered on July 14, 2014. This appeal followed.

## II. Standard of Review

The petitioner appeals the circuit court's order denying her post-trial motions for a new trial or a judgment of acquittal. We apply the following standard when reviewing a circuit court's decision to deny a motion for new trial:

---

[6]The petitioner's concern about unsupervised visitation apparently pertained to her husband's alcoholism and the fact that his girlfriend had a drug problem.

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). Furthermore, "[t]he Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W.Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citing *State v. LaRock*, 196 W.Va. 294, 304, 470 S.E.2d 613, 623 (1996)). Where more particularized standards of review apply to specific assignments of error, they are set forth below. With this in mind, we consider whether the petitioner is entitled to the reversal of her conviction.

### III. Discussion

### A. Admission of Medical Examiner's Opinion

The petitioner contends that the circuit court erred by denying her motions in limine to prohibit the deputy medical examiner from testifying that Mr. Surbaugh may have suffered an air embolism. Noting that Dr. Mahmoud offered this particular opinion as a possibility, and that this opinion was contradicted by her own experts, she argues it was mere speculation which the trial court should have excluded as unreliable. In response, the State argues that Dr. Mahmoud was a qualified expert and all of his opinions were properly

admitted into evidence at trial. The State further asserts that when considering Dr. Mahmoud's use of the word "possible" in context with his entire testimony, it is clear the doctor intended to communicate that an air embolism was "probably" the specific mechanism of death.

Rule 702 of the West Virginia Rules of Evidence permits an expert witness to provide opinion testimony if it will assist the trier of fact.[7] Following the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), we held in *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993), that a trial court has a gatekeeper obligation to screen scientific expert opinions for admissibility. In *Wilt*, and later in *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995), "we explained that circuit courts must conduct a two-part inquiry under Rule 702 and ask: (1) is the witness [qualified as] an expert; and, if so, (2) is the expert's testimony relevant and reliable?" *San Francisco v. Wendy's Int'l, Inc.*, 221 W.Va. 734, 741, 656 S.E.2d 485, 492 (2007).[8]

---

[7]When this case went to trial beginning in February of 2014, Rule 702 provided as follows: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[8]Certainly, not every opinion offered by a physician in a trial requires a *Daubert/Wilt* analysis. The circuit court conducted such an analysis in this case because the petitioner asserted that Dr. Mahmoud was offering an unreliable scientific opinion.

In this case, we can quickly dispose of the issues of qualification and relevance.

The test for determining a witness's qualification to serve as an expert is set forth in *Gentry*:

> In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

195 W.Va. at 515, 466 S.E.2d at 174, syl. pt. 5. In her brief, the petitioner did not analyze Dr. Mahmoud's qualifications in terms of the *Gentry* test. However, our review of the appendix record reveals that Dr. Mahmoud, a licensed medical doctor and experienced medical examiner, possessed the requisite educational and experiential qualifications to render opinions about the victim's wounds, autopsy, and cause of death; that his field of forensic pathology was relevant to this murder case; that his opinions assisted the jury; and that his area of expertise covered the opinions he offered at trial. Indeed, during trial the defense counsel only "reserv[ed] my right to cross on his qualification, as to a matter of weight, I have no objection to him being . . . qualified" as an expert in the field of forensic pathology. As such, it was not error for the circuit court to have qualified Dr. Mahmoud as an expert witness. Furthermore, Dr. Mahmoud's testimony about the victim's wounds and cause of death was relevant to this case given that the petitioner was charged with murdering her husband by shooting him in the head.

The petitioner's argument focuses on whether Dr. Mahmoud's opinion concerning the possibility of an air embolism was reliable. With regard to the question of reliability, a majority of this Court held that

> [w]hen a trial court is called upon to determine the admissibility of scientific expert testimony, in deciding the "reliability" prong of admissibility the focus of the trial court's inquiry is limited to determining whether the expert employed a methodology that is recognized in the scientific community for rendering an opinion on the subject under consideration. If the methodology is recognized in the scientific community, the court should then determine whether the expert correctly applied the methodology to render his or her opinion. If these two factors are satisfied, and the testimony has been found to be relevant, and the expert is qualified, the expert may testify at trial.

Syl. Pt. 2, *Harris v. CSX Transport, Inc.*, 232 W.Va. 617, 753 S.E.2d 275 (2013). It is important to recognize that the analysis of reliability does not ask whether the expert's opinion is correct:

> The assessment of whether scientifically-based expert testimony is "reliable," as that term is used in . . . [*Daubert* and *Wilt*], does not mean an assessment of whether the testimony is persuasive, convincing, or well-founded. Rather, assessing "reliability" is a shorthand term of art for assessing whether the testimony is to a reasonable degree based on the use of knowledge and procedures that have been arrived at using the methods of science–rather than being based on irrational and intuitive feelings, guesses, or speculation. If the former is the case, then the jury may (or *may* not, in its sole discretion) "rely upon" the testimony.

*Harris*, 232 W.Va. at 621-22, 753 S.E.2d at 279-80 (*quoting In re Flood Litig. Coal River Watershed*, 222 W.Va. 574, 582 n.5, 668 S.E.2d 203, 211 n.5 (2008)). This Court

emphasized in *Gentry* that "[*t*]*he problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable.*"* 195 W.Va. at 523, 466 S.E.2d at 182.

The circuit court held an in camera hearing before allowing Dr. Mahmoud to testify before the jury. During this hearing, Dr. Mahmoud explained the reasoning behind his air embolism opinion, and the petitioner did not present any contrary evidence. The trial court concluded that the issues petitioner raised regarding this opinion went to the weight to be given the testimony, not to its admissibility; therefore, Dr. Mahmoud was permitted to offer this opinion.

Dr. Mahmoud testified that after performing the autopsy, he classified Mr. Surbaugh's death, to a reasonable degree of medical certainty, as a homicide caused by three gunshot wounds to the head. As to the exact mechanism in which the gunshot injuries resulted in death, he ruled out other scenarios and opined that the victim had possibly suffered an air embolism due to air being introduced into the bloodstream through the open sinus cavity wound. Dr. Mahmoud explained that when air enters the circulatory system and travels to the heart, it can cause a sudden cardiopulmonary episode and death. Although Dr. Mahmoud could not characterize his air embolism opinion as a medical certainty, he explained that he reached it after considering and rejecting other potential mechanisms of

10

death. Dr. Mahmoud stated that he took into account the fact that the autopsy showed the victim had not bled to death or died from shock; the bullets had not damaged any internal organs or made it through the cranium into the brain; the victim had been alert after the shooting but suddenly "crashed" into cardiac arrest; and an air embolism is not uncommon in cases of gunshot wounds to the head. Dr. Mahmoud testified he did not perform certain pre-autopsy tests that can sometimes detect an air embolism because the victim's injuries had not initially led him to suspect this condition. He explained that the majority of gunshot wounds are fatal due to internal organ damage, and it was too late to perform the tests after the autopsy began and the body was surgically exposed to air. Dr. Mahmoud's opinion on the possibility of an air embolism was subject to lengthy cross-examination. Further, the petitioner's experts testified that the copious amount of fluid in the victim's intubation tube at the time he was being loaded onto the helicopter, the increased weight of the victim's lungs as measured during the autopsy, and the lack of frothy blood in the autopsied heart, all indicate that pulmonary edema from excess administration of fluid was the specific mechanism of death.

Dr. Mahmoud testified that his methodology of considering and rejecting different causes is a way that doctors diagnose medical conditions and reach conclusions on causation. Our review of the trial transcript shows that Dr. Mahmoud's methodology bears no marked difference from the scientific method used in *San Francisco*, where a doctor

11

considered but rejected various causes for a patient's intestinal distress to conclude that the cause was ingestion of undercooked meat. *San Francisco*, 221 W.Va. at 746, 656 S.E.2d at 497. This Court held that the doctor's methodology could lead to a reliable opinion under Rule 702 and *Wilt*. *San Francisco*, 221 W.Va. at 738, 656 S.E.2d at 489, syl. pt. 5.

The petitioner does not dispute that considering and eliminating different possible mechanisms of death was an acceptable methodology for the deputy medical examiner to have used. Rather, she challenges Dr. Mahmoud's testimony because he did not perform certain tests that might have detected the presence of an air embolism. Dr. Mahmoud explained why those tests were not performed and that they do not always provide accurate results. This issue goes to the weight to be given the evidence, not to its admissibility:

> Following a trial court's decision that a physician is qualified to offer expert testimony in a given field, issues that arise as to the physician's personal use of a specific technique or procedure to which he or she seeks to offer expert testimony go only to the weight to be attached to that testimony and not to its admissibility.

Syl. Pt. 3, *Walker v. Sharma*, 221 W.Va. 559, 655 S.E.2d 775 (2007); *accord Gentry*, 195 W.Va. at 527, 466 S.E.2d at 186 ("Disputes as to the strength of an expert's credentials, mere differences in the methodology, or lack of textual authority for the opinion go to weight and not to the admissibility of the[] testimony.").

12

The petitioner also argues that the air embolism opinion was unreliable because Dr. Mahmoud offered it only as a possible mechanism of death. Critically, Rule of Evidence 702 speaks in terms of assisting the trier of fact. An opinion derived from a scientifically-recognized methodology, which is otherwise admissible under the law set forth in *Wilt* and its progeny, may be of assistance to the jury even if the expert is not absolutely certain of his or her conclusion. *See* Louis J. Palmer, Jr., Robin Jean Davis, Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 702.02[4][b] (6th ed. 2015) ("The physician may testify as to the 'possible' causal relationship between the plaintiff's condition and the cause of that condition.").

After carefully reviewing the record on appeal and the applicable authority, we conclude that Dr. Mahmoud's air embolism opinion was admissible. Whether this opinion was correct or incorrect was not for the trial court or this Court to decide. The petitioner was permitted to cross-examine Dr. Mahmoud, offer contrary expert testimony, and argue that Dr. Mahmoud's opinion should be disregarded. The decision regarding the amount of weight to attribute to that opinion rested with the jury. *See Martin v. Charleston Area Med. Ctr.*, 181 W.Va. 308, 311, 382 S.E.2d 502, 505 (1989) (reaffirming proposition that jury has right to weigh testimony of all witnesses, expert and otherwise).

13

## B. Sufficiency of the Evidence Proving the Corpus Delecti of Murder

"In any case of homicide there must be proof of the identity of the deceased and the causation of death." *State v. Myers*, 171 W.Va. 277, 280, 298 S.E.2d 813, 817 (1982). The petitioner argues the State failed to prove that the gunshots caused her husband's death. She contends that his wounds were not fatal and death was instead the proximate result of an intervening cause, specifically, the allegedly negligent medical care that Mr. Surbaugh received in the treatment of those wounds. "An intervening cause is a new and independent force which breaks the causal connection between the original act or omission and the injury, and itself becomes the direct and immediate cause of the injury." *State v. Nester*, 175 W.Va. 539, 542, 336 S.E.2d 187, 189 (1985) (citation omitted). Thus, the petitioner argues the State failed to prove the criminal agency aspect of the corpus delicti of murder:

> "Under our decisions, the corpus delicti consists in cases of felonious homicide, of two fundamental facts: (1) the death; and (2) the existence of criminal agency as a cause thereof. The former must be proved either by direct testimony or by presumptive evidence of the strongest kind; but the latter may be established by circumstantial evidence or by presumptive reasoning upon the facts and circumstances of the case." Point 6 Syllabus, *State v. Beale*, 104 W.Va. 617[, 141 S.E. 7 (1927)].

Syl. Pt. 1, *State v. Durham*, 156 W.Va. 509, 195 S.E.2d 144 (1973). The State responds that after hearing all of the evidence and argument, the jury rejected the petitioner's contentions when it concluded that she was guilty of first degree murder. Our review of the law and the evidence at trial convinces us there is no reversible error on this issue.

14

*Durham*, like the case sub judice*,* involved a wife shooting her husband. *See Durham*, 156 W.Va. 509, 195 S.E.2d 144. The shot went through the victim's body without damaging any vital organs. Although doctors deemed the wound to be of a minor nature, surgery was performed to clean and repair it. The victim died the following day because either the gunshot injury or the surgical anesthesia aggravated his pre-existing liver disease. The medical evidence revealed that the bullet wound, by itself, would not have caused death. *Id.* at 519, 195 S.E.2d at 150. The defendant argued that the State failed to prove the corpus delicti of murder because the evidence did not establish the gunshot wound she inflicted was the cause of death.

After considering the pertinent authority, the Court reaffirmed the rule that the corpus delicti of felonious homicide requires "the existence of criminal agency as a cause thereof." *Durham*, 156 W.V.a. at 509, 195 S.E.2d at 145, syl. pt. 1 (*quoting Beale*, 104 W.Va. at 619, 141 S.E. at 7-8, syl. pt. 6). Notably, this law provides that the existence of a criminal agency must be "a cause" of the death; it does not say "the cause" or "the only cause." *See id.* The Court went on to announce two new points of law:

> 2. In order to sustain a conviction for felonious homicide, the corpus delicti is properly proved by sufficient evidence showing that the initial wound caused the death indirectly through a chain of natural causes.
>
> 3. A defendant may be held criminally responsible where he inflicts upon another a wound resulting in death, even though the cause of death is related to the proper treatment of the

15

> wound or related to such treatment or effect of a preexisting
> physical disability of the victim.

*Durham*, 156 W.Va. at 509, 195 S.E.2d at 145, syl. pts. 2, 3. The prosecution theorized that Ms. Durham was criminally responsible because the wound she inflicted caused the death indirectly through a chain of natural events. The jury heard the evidence and found that the gunshot wound was a cause of death, and this Court had no basis on which to conclude that the jury's finding was wrong. The Court therefore affirmed Ms. Durham's conviction for voluntary manslaughter.

The petitioner seeks to distinguish her situation from *Durham* because, according to her theory of the case, her husband did not receive "*proper* treatment of" his gunshot wounds. *See Durham*, 156 W.Va. at 509, 195 S.E.2d at 145, syl. pt. 3, in part (emphasis added). However, we conclude that the word "proper" in *Durham* syllabus point three is not dispositive of the petitioner's case. In *Durham,* there was no issue of medical malpractice or of any wrongdoing by anyone other than the defendant. The Court was not called upon to address the argument the petitioner raises in this case.[9]

---

[9]In their briefs, neither the petitioner nor the State cite to any legal authority directly on point to this assignment of error, i.e., authority involving medical negligence as a possible intervening cause of death in a homicide case.

16

This Court revisited the issue of causation in a criminal case in *State v. Jenkins*, 229 W.Va. 415, 729 S.E.2d 250 (2012), where a defendant was convicted of felony murder based upon his delivery of oxycodone to his teenaged son. The son died of a drug overdose that exacerbated a prior health condition. Pathologists concluded that the victim, who also had access to other drugs, died as a result of ingesting a combination of oxycodone and valium. The defendant asserted that to sustain his conviction, the State had to prove that the oxycodone he delivered was the sole cause of death. After discussing *Durham*, this Court concluded that to sustain the defendant's conviction,

> all that the State was required to prove was that the death was simply *a result of* the delivery of the oxycodone. Nothing in our prior jurisprudence leads us to conclude that the State was required to prove that the delivery of the oxycodone was the sole cause of death.

*Jenkins*, 229 W.Va. at 429, 729 S.E.2d at 264.

Almost a century ago, this Court addressed an intervening causation defense where faulty medical care may have contributed to the death. In *State v. Snider*, 81 W.Va. 522, 94 S.E. 981 (1918), the defendant shot the victim in the abdomen. During exploratory surgery the surgeon found that the bullet had not entered the abdominal cavity; however, upon noticing that the victim's appendix was diseased, the surgeon removed it as a precaution against future appendicitis. The appendectomy was unrelated to the treatment of the gunshot wound. Although there were no complications during the surgery, the next day

17

the victim's condition rapidly deteriorated and he died. The trial court refused to give a jury instruction that the defendant could not be convicted of homicide if the surgeon's negligence in performing the surgery hastened the death. *Id.* at 529, 94 S.E. at 984. Upholding that ruling, this Court held as follows:

> 8. If, after a mortal wound has been inflicted upon a person and while he is still living, a second injury is inflicted upon him, and he subsequently dies from the effects of both, the first one contributing to the death, the perpetrator of the first injurious act is not exonerated from the charge of homicide[] by the perpetration of the second.
>
> 9. To effect such exoneration the intervening injury must have been the proximate cause of the death.

*Id.* at 523, 94 S.E. at 982, syl. pts. 8 & 9. The Court concluded that "[m]ere contribution to the result of a mortal wound by a subsequent act of a responsible agency does not excuse the original act." *Id.* at 529, 94 S.E. at 984. Criminal responsibility is only destroyed if the wound inflicted by the defendant made no contribution to the death:

> The test of the guilt of the person inflicting the first wound in such case is whether, when death occurred, the first wound contributed to the event. If it did, although other independent causes also contributed, the causal relation between the unlawful acts of the accused and the death is made out." Whar. Hom. 3d Ed., sec. 33.

81 W.Va. at 530, 94 S.E. at 984.

In the petitioner's case, even if there was medical negligence in the treatment of Mr. Surbaugh's gunshot wounds, the evidence does not support a finding that medical

18

negligence was "a new and independent force which br[oke] the causal connection between the original act . . . and the injury, and itself bec[ame] the direct and immediate cause of the injury." *See Nester*, 175 W.Va. at 542, 336 S.E.2d at 189. Mr. Surbaugh was shot three times in the head and had bullet fragments embedded in his sinus cavity. Multiple witnesses, including the petitioner, testified that Mr. Surbaugh was bleeding heavily. His condition required emergency medical treatment and transfer by helicopter to a trauma hospital. He would not have required any medical care–including the administration of intravenous fluid–but for the gunshot wounds, and the purported negligence occurred in the course of treating him for these wounds. Certainly, the gunshots were "a cause" of death under the analysis in *Jenkins*, 229 W.Va. at 429, 729 S.E.2d at 264, and were "a contributing cause" of death under the analysis in *Snider*, 81 W.Va. at 523, 94 S.E. at 982.

To conclude otherwise would run contrary to *Durham* and *Jenkins*. It would be absurd to hold a defendant criminally responsible when her actions combined with the victim's preexisting condition caused death, but not hold a defendant criminally responsible when her actions combined with the actions of another person caused death.

Our analysis of this issue is supported by legal commentators and case law from other jurisdictions. For example, Professor LaFave explains that mere negligence in

the medical care of a victim's wound will not serve as an intervening cause to break the chain of criminal proximate causation:

> The most common case [of an intervening cause by the acts of a third person] involves the negligent treatment of wounds by a doctor or nurse. *A*, intending to kill *B*, merely wounds him; but the doctor so negligently treats the wound that *B* dies. It is generally held that *A* is guilty of murdering *B*, i.e., that *A*'s act legally caused *B*'s death, unless the doctor's treatment is so bad as to constitute gross negligence or intentional malpractice. In short, mere negligence in medical treatment is not so abnormal that the defendant should be freed of liability.

1 Wayne R. LaFave, Substantive Criminal Law § 6.4(f)(5) (2d ed. 2003) (footnotes omitted); *accord* Carolyn Kelly MacWilliams, Annotation, *Homicide: liability where death immediately results from treatment or mistreatment of injury inflicted by defendant*, 50 A.L.R.5th 467 (1997) (explaining that "[a] person who inflicts a mortal or dangerous wound upon another is generally held criminally liable for the victim's resulting death, even in those instances where medical negligence or mistreatment also contributed to the victim's death. The courts have recognized a defense to a charge of homicide only when the treating physician has acted in a grossly negligent manner and that gross medical negligence was the sole cause of the victim's death."); *see also* 40 Am.Jur.2d Homicide § 18 (2008); 40 C.J.S. Homicide § 10 (2014); 1 Charles E. Torcia, 1 Wharton's Criminal Law § 26 (15th ed. 1993).

The case of *People v. Saavedra-Rodriguez*, 971 P.2d 223 (Colo. 1999), is instructive. A defendant stabbed his victim in the chest, puncturing vital organs. The victim

20

was rushed to a hospital, where the treating physician reportedly made several errors in the diagnosis and treatment of the wound, and the victim died. In defense of the resulting second degree murder charge, the defendant argued that the doctor's improper medical care was the intervening cause of death. Rejecting the defendant's argument, the Colorado Supreme Court explained there are two components to an intervening cause defense: "an intervening cause is a defense to the charge of homicide if it is unforeseeable, and [is] a cause without which death would not have occurred." *Id.* at 226. The court added that "[s]imple negligent medical treatment, although hopefully unusual, is sufficiently ordinary that we consider it foreseeable. Negligence, unfortunately, is entirely too frequent a human conduct to be considered 'abnormal.'" *Id.* (internal citations omitted). However, the court recognized that gross medical negligence can serve as an intervening cause: "unlike simple negligence, gross negligence is sufficiently extraordinary to be classified as unforseeable. Where medical treatment is so deficient as to constitute gross negligence or intentional malpractice, such medical treatment is abnormal and not reasonably foreseeable." *Id.* (internal citations omitted). The court defined "grossly negligent medical treatment" as "the cause but for which death would not have occurred when it disrupts the natural and probable sequence of events following the defendant's act and intervenes to cause the victim's death." *Id.*

Similarly, in *State v. Mays*, 85 P.3d 1208 (Kan. 2004), the Supreme Court of Kansas affirmed a first degree murder conviction where medical negligence was involved

21

in the victim's death. The defendant shot the victim, who despite being injured was able to flee the scene on foot. *Id.* at 1213. While the victim was being treated in an emergency room, medical providers incorrectly inserted both a chest tube and an endotracheal tube. Instead of rendering aid, the incorrectly-inserted endotracheal tube cut off the victim's breathing and the victim died. *Id.* at 1221. A medical expert testified at trial that had the intubation been performed correctly, the victim would have had a good chance of survival. The Kansas Supreme Court rejected the defendant's argument that medical negligence was the intervening cause of death, noting the expert's testimony that the gunshot wounds caused the death and without any medical treatment the victim would have bled to death from his wounds. *Id.* at 1222. The court held: "Where a person inflicts upon another a wound which is calculated to endanger or to destroy life, it is not a defense to a charge of homicide that the victim's death was contributed to or caused by the negligence of the attending physicians or surgeons." *Id.* at 1212, syl. pt. 12.

Courts in other states are in accord. *See, e.g., People v. Scott*, 939 P.2d 354, 371 (Ca. 1997) (explaining that if person inflicts dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to death; only grossly improper medical treatment that is sole cause of death and thus unforseeable can discharge criminal liability); *State v. Jacobs*, 479 A.2d 226, 229-230 (Conn. 1984) (citation omitted) ("where a wound, either operating directly or indirectly, by causing some other condition which

22

produces death, has been a substantial factor in causing a death, it is still to be regarded as the case of the death even though some negligence in the treatment of the wounded man by physicians and others is also a contributing factor."); *Neal v. State*, 722 S.E.2d 765, 768 (Ga. 2012) (recognizing that even if medical treatment of felonious injury was negligent, negligence would not normally constitute an intervening cause to criminal culpability unless it was gross mistreatment); *Wooley v. State*, 716 N.E.2d 919, 928 (Ind. 1999) (stating that for intervening cause to break chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold defendant responsible; someone who inflicts injury upon another is guilty of homicide if injury "contributed mediately or immediately" to death); *State v. Garcia*, 616 N.W.2d 594, 597 (Iowa 2000) (citation omitted) ("for an intervening act to relieve a defendant of criminal responsibility for homicide, the intervening act must be the *sole* proximate cause of death."); *People v. Griffin*, 610 N.E.2d 367, 368-69 (N.Y. 1993) (citation omitted) ("If a felonious assault is operative as a cause of death, the causal cooperation of erroneous surgical or medical treatment does not relieve the assailant from liability for the homicide. It is only where the death is solely attributable to the secondary agency, and not at all inducted by the primary one, that its intervention constitutes a defense.").[10]

---

[10]There are also cases holding that the decision to terminate a victim's life support is not an independent intervening cause capable of breaking the chain of causation triggered by a defendant's wrongful actions. *See, e.g.*, *Roberts v. Ballard*, No. 1:13-23245, 2014 WL 4929403, *2-4 (S.D.W.Va. Sept. 30, 2014) (applying *Durham*, 156 W.Va. 509, 195 S.E.2d 144); *State v. Pelham*, 824 A.2d 1082 (N.J. 2003).

23

After carefully considering our case law and the persuasive authority of other jurisdictions, we conclude, and now hold, that if a person inflicts a wound upon a person who thereafter dies, it is not a defense to a criminal homicide charge that medical care in the treatment of that wound contributed to the victim's death. Only medical care that is shown to be the sole cause of death will operate to break the chain of causation and relieve the defendant of criminal responsibility.

In the case sub judice, the circuit court instructed the jury that it should find the petitioner not guilty if there was reasonable doubt about whether gunshot wounds inflicted by the petitioner caused the death. The jury was the trier of fact. It heard extensive evidence from both fact and expert witnesses regarding the circumstances and cause of death. We have no basis to second-guess the jury's decision of guilt.

### C. The State's Destruction of Evidence

The petitioner argues that her indictment should have been dismissed because the State destroyed evidence. During the investigation, the police took possession of bed linens that were on the Surbaughs' bed at the time of the shootings. Sheriff's Deputy Rick Clayton testified that the linens, which he described as being "fairly saturated" with the victim's blood, were stored in an evidence locker at the sheriff's office until after the

24

conclusion of the petitioner's first trial in 2010.[11]  After the jury found her guilty in the first trial, but before that conviction was reversed by this Court on appeal, Deputy Clayton disposed of the linens.  He explained that the sheets had not been used as evidence during the trial and were emitting a terrible odor.  The deputy obtained permission from the sheriff to dispose of this evidence, but did not inquire of the circuit court, prosecutor, or defense counsel before doing so.  At trial, the court read a stipulation to the jury advising that the State had destroyed the bed linens.

The following analysis applies when the State has destroyed evidence sought by a criminal defendant:

> When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either *West Virginia Rule of Criminal Procedure* 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach. In determining what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

---

[11]See *supra*, note 1.

Syl. Pt. 2, *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995).

Prior to the first trial, the defense did not examine or test the linens. For purposes of her re-trial, however, the petitioner asserted that she wanted to have an expert test them for the presence of gunshot residue. She contends that the presence and pattern of residue on the linens, or the lack thereof, would be probative on the disputed factual issue of whether she shot her husband while he was lying asleep or while he was in an upright position coming toward her.

The State responds by arguing that it had no duty to maintain the bed linens after the petitioner failed to use them in her first trial. Notably, the State does not cite any authority for this proposition. We can conceive of no reason why the petitioner, given the opportunity to re-try her case with different counsel, would have been barred from having an expert examine and test the linens and, assuming the test results were otherwise admissible, using the results at her new trial. This Court has previously addressed what evidence the State may offer in the re-trial of a criminal case: "The fact that the prosecution refrained from presenting an item of evidence at the first trial is not grounds for an objection to its admission in any subsequent trial." Syl. Pt. 7, *State v. Clements*, 175 W.Va. 463, 334 S.E.2d 600 (1985). A defendant would similarly not be bound by the evidence admitted at the first trial.

26

We turn to the last three elements of the *Osakalumi* test, which address what consequences should flow from the State's breach of duty: the degree of negligence or bad faith involved; the importance of the missing evidence; and the sufficiency of the other evidence to sustain the conviction. *Id.* at 759, 461 S.E.2d at 505. The circuit court found no bad faith on the deputy's part. Although the petitioner argues the circuit court erred by not finding that the State was especially negligent when disposing of the sheets, we disagree. Given that the bed linens were not previously examined or used at trial, we conclude that the officer's degree of negligence was low when he deemed the malodorous sheets to be disposable.

The purported importance of this evidence is speculatory. The petitioner failed to offer an expert who was qualified to render opinions regarding gunshot residue or residue patterns.[12] Without such an expert, it is unknown whether any gunshot residue would still be detectable or in a discernable pattern given the copious blood on the sheets and the fact that the sheets had been folded and in storage. Moreover, even under the petitioner's version of events, the shootings occurred on or near the bed, so it is doubtful that the presence of gunshot residue on the linens would support either party's case. Furthermore, the State did

___

[12]The petitioner offered an expert who was ultimately qualified to render opinions in other areas, but not on gunshot residue. The circuit court permitted this expert to identify for the jury different tests for gunshot residue that can be used on fabric, without rendering any opinion on what those tests might have shown.

not make any argument at trial about gunshot residue on the bed linens. *See State v. Paynter*, 206 W.Va. 521, 532, 526 S.E.2d 43, 54 (1999) (rejecting *Osakalumi* argument where State had not used lost gunshot residue evidence in case-in-chief against defendant). Through the parties' written stipulation, the jury was informed that the deputy had destroyed the bed linens. *See Paynter*, 206 W.Va. at 530, 526 S.E.2d at 52 (cautionary instruction was proper consequence of State's breach of duty to preserve evidence where State did not use evidence in case-in-chief). The petitioner's counsel was free to argue this issue during closing argument. Finally, as described below, there was sufficient evidence to establish the petitioner's guilt beyond a reasonable doubt. Accordingly, we find no error on this issue.

### D. Sufficiency of the Evidence to Support the Conviction

The petitioner argues that the State's evidence at trial was insufficient to support her conviction for first degree murder. It is well-settled that a criminal defendant challenging the sufficiency of the evidence on appeal has a heavy burden.

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a

28

reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 1.

While Mr. Surbaugh and the petitioner were home alone, Mr. Surbaugh suffered three gunshot wounds to his head. Over the next few hours, he consistently reported that the petitioner had shot him while he slept. He said that he was awakened by a severe pain that felt like a baseball bat hitting his skull. In contrast, the petitioner gave differing versions of what happened. First she said her husband shot himself, then she said the shooting was accidental, then she claimed self-defense and that the last shot was self-inflicted. The petitioner's trial testimony was contradicted by the neighbor who did not hear any sounds of a struggle, any speaking, or any screaming. The neighbor heard only gunshots and groans.

Mr. Surbaugh was planning on leaving the marital home, and the jury heard directly from the petitioner how concerned she was that her husband would receive unsupervised visitation with their children. Furthermore, although the petitioner claims that one of her husband's head wounds was self-inflicted, this does not comport with the fact that he had plans to take a trip later that day. He even called his girlfriend while he awaited the ambulance, to tell her he would be late for their trip.

The petitioner's argument about the sufficiency of the evidence focuses on the testimony of Professor Andrew Wheeler, her expert on blood splatter evidence. After examining crime scene photographs, the Surbaughs' bedroom, and blood remaining on the ceiling years after the shooting, Professor Wheeler opined that blood splatter on the ceiling resulted from the two shots that went through the side of Mr. Surbaugh's face. Furthermore, he concluded that those shots had not been fired while the victim was lying in a supine position.

Viewing all of the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence to convict the petitioner of first degree murder. Professor Wheeler acknowledged that the splatter on the ceiling was not caused by the shot to the other side of Mr. Surbaugh's head, from which the bullet did not exit. Furthermore, there was blood in multiple areas of the room, including on a pillow. Mr. Surbaugh had bled

30

profusely, had moved about the home after being shot and, as the State contended, may have shaken his head. The jury heard and saw the evidence–including by personally viewing the inside of the Surbaugh's home, hearing descriptions of the crime scene and viewing the photographs, and even watching the petitioner demonstrate her testimony by using a bed that was brought into the courtroom. As there was evidence from which the jury could find guilt beyond a reasonable doubt, we have no basis upon which to overturn their decision.

## E.  Jury Instructions and Verdict Form

The petitioner assigns error to the circuit court's refusal to give three of her proposed jury instructions and with regard to the wording of the jury verdict form. Our law regarding jury instructions is well-settled:

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

*Guthrie*, 194 W.Va. at 663-64, 461 S.E.2d at 169-70, syl. pt. 4. Furthermore,

> [a] trial court's refusal to give a requested instruction is reversible error only if:  (1) the instruction is a correct statement

31

> of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Syl. Pt. 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

In her proposed jury instruction number seven, the petitioner wanted the circuit court to instruct the jury that "[m]edical opinion testimony as to the possibility as to the causal relationship between an injury and subsequent death is not sufficient standing alone to establish the causal relationship." This instruction pertains to her argument, which we rejected in section III-A of this opinion, that Dr. Mahmoud should have been prohibited from offering his opinion regarding an air embolism. For the same reasons we found no merit to the petitioner's argument about the admissibility of Dr. Mahmoud's testimony, there is no error in the trial court's refusal to give this jury instruction.

The petitioner also argues that the trial court erred in refusing to use defendant's proposed instruction number eight, the instruction her counsel drafted based on *Durham*, 156 W.Va. 509, 195 S.E.2d 144. She argues that her instruction would have properly informed the jury regarding the consideration of contradictory evidence as creating reasonable doubt about the cause of death. We review jury instructions as a whole. *Guthrie*, 194 W.Va. at 663-64, 461 S.E.2d at 169-70, syl. pt. 4. The record reveals that the circuit court gave instructions on both *Durham* and reasonable doubt, and the petitioner does not

32

explain why her concerns were not substantially covered in the given instructions. *See Derr,* 192 W.Va. at 168, 451 S.E.2d at 734, syl. pt. 11. Accordingly, we find no abuse of discretion in the trial court's ruling.

Next, the petitioner contends that the circuit court erred in refusing to give her proposed instruction number five based upon *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009) and *State v. Stewart*, 228 W.Va. 406, 719 S.E.2d 876 (2011). These cases hold, inter alia, that a defendant's history of being abused may be relevant to her state of mind. Our review of the trial transcript reveals that the trial court did give a *Harden* instruction, specifically, defendant's instruction number six: "If you the jury find beyond a reasonable doubt that Julia Surbaugh was not acting in self-defense, evidence that Michael Surbaugh had mentally abused Julie Surbaugh is nonetheless relevant and may negate a necessary element of the offense charged such as malice or intent."[13] The petitioner does not explain why the instruction given was insufficient. As such, we find no error in the trial court's refusal to give defendant's proposed instruction number five.[14]

---

[13]Syllabus point four of *Harden* provides, "[w]here it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent." 223 W.Va. at 799, 679 S.E.2d at 630.

[14]In response to this assignment of error, the State argues that because the petitioner adduced no evidence of abuse, either physical or mental, a *Harden* instruction would have been impermissible and unnecessary. However, the State fails to acknowledge that the trial court did give one of the petitioner's two proposed *Harden* instructions. Although there was

As to the jury verdict form, the petitioner merely argues that the form used by the trial court "in effect encouraged the jury to not consider self-defense in their deliberation, to the extreme prejudice of Petitioner." She fails to explain how the verdict form did this. Moreover, she does not assert any error with regard to the instructions that the trial court gave on self-defense and the elements of the crimes.[15] As such, we find no merit to this assignment of error.

## F. Admission of Petitioner's Statements

Finally, in an assignment of error that is only four sentences long, the petitioner asserts that the circuit court erred when admitting into evidence her multiple statements made to police on August 11 and 12, 2009. First, we note that the admissibility of the petitioner's third statement to police was affirmed on the merits in *Surbaugh I*, 230 W.Va. at 226, 737 S.E.2d at 254. "'The general rule is that when a question has been definitely determined by this Court its decision is conclusive on parties, privies and courts, including this Court, upon a second appeal or writ of error and it is regarded as the law of the case.' Syllabus point 1, *Mullins v. Green*, 145 W.Va. 469, 115 S.E.2d 320 (1960)." Syl. Pt. 6, *Hatfield v. Painter*, 222 W.Va. 622, 671 S.E.2d 453 (2008).

---

no evidence of any physical abuse, the circuit court concluded that in the second trial the petitioner had offered "tangential evidence" of mental abuse in the marriage.

[15]The jury was instructed on first degree murder and the lesser-included offenses of second degree murder and voluntary manslaughter.

Second, to the extent that the petitioner is now complaining about her other statements to police, she has failed to set forth sufficient grounds for appellate review. "In the absence of supporting authority [or facts], we decline further to review this alleged error because it has not been adequately briefed." *State v. Allen*, 208 W.Va. 144, 162, 539 S.E.2d 87, 105 (1999); *see also State v. LaRock*, 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority, are not considered on appeal."). Accordingly, we decline to address the admissibility of the petitioner's other statements to police.

## IV. Conclusion

For the foregoing reasons, the order of the Circuit Court of Webster County denying the petitioner's motions for a new trial or a judgment of acquittal is affirmed.

Affirmed.